STATE of Minnesota, Respondent,

v.

Chaun Dubae CARRIDINE, Appellant.

No. A09–1412.

Supreme Court of Minnesota.

May 9, 2012.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Jodie L. Carlson, Assistant State Public Defender, St. Paul, MN, for appellant.

OPINION

ANDERSON, G. BARRY, Justice.

A Hennepin County jury found Chaun Dubae Carridine guilty of first-degree premeditated murder in the shooting death of Lorenzo Guffie. The district court convicted Carridine of that offense and sentenced him to life in prison. In this direct appeal, Carridine challenges his conviction on five grounds: (1) the district erred by rejecting his challenges to the State's exercise of two peremptory strikes; (2) the district court committed prejudicial error when it allowed the State to impeach him through his prior statement; (3) the district court committed prejudicial error when it instructed the jury; (4) the State committed prejudicial prosecutorial misconduct; and (5) recusal of the district court judge was required.[1] We affirm.

It is undisputed that Carridine shot Lorenzo Guffie on the night of June 3, 2007, outside of Palmer's Bar in the Riverside neighborhood of Minneapolis. As a result of the shooting, Guffie died at Hennepin County Medical Center the following morning. At trial, Carridine argued that he was acting in self-defense and that he did not intend to shoot Guffie.

*State's Witnesses*

The State's witnesses testified to the following at trial. On the day of the shooting, June 3, 2007, A.P. picked up Carridine at an apartment in the Riverside neighborhood and went to Palmer's Bar, a few minutes away from the apartment. They arrived at the bar around 11:00 p.m. As they were walking through the bar to the patio, Carridine saw Guffie and said he couldn't believe the "motherfucker" who robbed him was there and Carridine was without his gun. Carridine said he needed to call his brother to get his gun. Guffie was with his girlfriend, Lamonte White, Charles Bilbro, and four others. Guffie and his girlfriend had driven to Minneapolis with White from their home in Rochester to meet friends at Palmer's Bar.

Inside the bar, Carridine and Guffie began arguing. Guffie's associates, Bilbro and White, saw the argument, and Bilbro heard Carridine ask Guffie, "[w]hy you rob me?" Bilbro also heard Guffie tell Carridine to "[s]top saying I robbed you." There was no physical confrontation at that time. Bilbro and White successfully broke up the argument. A bartender also stepped in between Carridine and Guffie and asked what was going on. Carridine told the bartender that he was "gonna to whoop this nigga's ass."

After the argument, Guffie, Guffie's girlfriend, Bilbro, and White left the bar. Carridine left shortly thereafter. As Guffie, Guffie's girlfriend, Bilbro, and White were walking across Cedar Avenue to a

---

1. Carridine concedes that our decision in *In re Jacobs*, which was decided after Carridine sought review of his conviction, controls the issue of whether recusal of the district court judge was required. *See* 802 N.W.2d 748, 751–54 (Minn.2011) (concluding that although the district court judge's wife was employed by the same office that was prosecuting the defendant for murder, the district court judge was not required to disqualify himself because (1) his wife had no personal involvement in the case; (2) his wife did not have more than a de minimis interest in the outcome of the case; and (3) the district court judge's impartiality could not be reasonably questioned). Based on *In re Jacobs*, we conclude that recusal of the district court judge was not required and further discussion of this issue is not necessary.

parking lot, Guffie and Carridine continued their argument. Bilbro heard Carridine ask "why he robbed," and Guffie told him to "stop saying it." During the argument, Guffie stood in the street, while Carridine stood on the sidewalk on the Palmer's Bar side of the street. Guffie was moving away from Carridine, crossing the street, during the argument. Carridine started walking southbound on the Palmer's side of the street, while Guffie, Guffie's girlfriend, Bilbro, and White crossed the street to the parking lot.

L.W., P.S., and B.J. were outside the bar. They saw Carridine and A.P. arrive at the bar together and witnessed the argument outside the bar. Carridine told P.S. to "[c]lear the block," which P.S. interpreted to mean that there was going to be trouble.

Meanwhile, Guffie was driving a car with his girlfriend, White, and Bilbro as passengers. Guffie backed out of the parking space and stopped at the entrance to the parking lot to wait for traffic to clear. Guffie's girlfriend and White saw Carridine walk up to the car and heard him say something before shooting at the car. Bilbro, who was unable to see the shooter, heard the shooter say something like, "get me some" or "pay me," saw a flash, ducked, and heard six or more gunshots. Guffie's car was moving forward in a swerving motion at the time of the shooting, and eventually crashed into a tree. After the crash, all of the passengers and Guffie left the vehicle and ran towards Palmer's Bar. White, who had a cell phone in his hand, dropped it somewhere between the car and Palmer's, and stopped to pick it up. Guffie, who had been shot, collapsed 30 feet from the bar. Bilbro called 911.

*Carridine's Testimony*

Carridine's testimony conflicted with that of the State's witnesses. He testified to the following at trial. On the day of the shooting, June 3, 2007, A.P. contacted Carridine to purchase drugs. A.P. picked up Carridine at his home in St. Paul and drove to an apartment in the Riverside neighborhood. After Carridine retrieved the drugs from the apartment, they went to Palmer's Bar, a few minutes away from the Riverside apartment. They arrived at the bar around 11:25 p.m., and Carridine had his handgun with him. As Carridine was walking through the bar to the patio, he recognized some men—Guffie, White, Bilbro, and four others—who he did not want to be around.

Carridine sat at the bar instead of going to the patio and was about to order a drink when Guffie approached and said, "I need to holler at you." After Guffie walked away and Carridine went to the bathroom to call for a ride, Carridine went back to the bar and attempted to order a drink when Guffie, White, and Bilbro approached him with a "hostile" attitude. They approached him from behind, and Guffie asked, "What's this shit I hear about you telling people that I'm a thief and I stick people up and I rob people." Carridine said he did not want any problems with Guffie or his companions, but after he turned his back, one of the three men hit him on the back of the head. A bartender stepped in between Carridine and Guffie and told them to break it up. As Guffie walked away, Carridine heard him say, "I'm going to lay your bitch ass down if you come outside." Carridine told the bartender that if "one of these motherfucking niggers put their hands on me again," he was "going to whoop one of their fucking asses."

After the argument with Carridine, Guffie, Guffie's girlfriend, Bilbro, and White left the bar. When Carridine left shortly thereafter, Guffie and his three companions were standing in the middle of the

street challenging Carridine to come out in the street to fight with them. Carridine heard them say, "Let's take it to the street." Carridine responded by saying, "Leave me the fuck alone." After Guffie, Guffie's girlfriend, Bilbro, and White crossed the street toward the parking lot, Carridine started walking southbound on the Palmer's Bar side of the street.

As Carridine crossed Cedar Avenue near the entrance to the parking lot, a car swerved, sped up, and hit him below the knees as he dove out of the way. The car door opened, Guffie pulled out a gun and said, "I told you I was going to lay your bitch ass down." Carridine said he was scared, his leg hurt, and he had no choice but to use his gun because he did not have time to get away. Carridine shot at the car while he was still on his knees and continued shooting until the car drove away. Carridine said that he did not intend to hit anyone; his intent was to shoot at the door until the car door closed.

Guffie's girlfriend, Bilbro, and White denied having a gun, denied that Guffie had a gun, and denied that Guffie hit anyone with the car.

*Testimony of J.J.*

J.J. testified on Carridine's behalf. J.J. was on the patio of the Nomad Bar on the night of the shooting. From where he was standing, he could see Palmer's Bar and the "hub-bub" on Cedar Avenue. He saw a group of "people hanging out" and thought that they were up to no good. One of the group received a call on his cell phone, and the group went around the corner. He lost sight of them and then saw flashes of gunshots coming from around the side of the building, heard a screech of tires, and saw a car hit a tree. There were three or four persons who left the vehicle, and one of them was holding his stomach or side. One of the persons who stepped out of the car may have had something in his hand. J.J. never testified that he saw a gun.

## I.

We first address Carridine's claim that the district court erred when it rejected his challenges to the State's exercise of two peremptory strikes during the jury-selection process. Carridine argues that he is entitled to a new trial because the State's proffered reasons for removing two jurors of color, J.C. and P.G., were a pretext for racial discrimination.

The exclusion of a potential juror from jury service based solely on race is prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *State v. Greenleaf,* 591 N.W.2d 488, 500 (Minn.1999). To determine whether a peremptory strike was discriminatory, we apply the three-step test articulated by the United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Greenleaf,* 591 N.W.2d at 500. That test requires the defendant to first make a prima facie showing that the strike of the prospective juror was made on the basis of race. *Id.* If a prima facie showing is made, the burden then shifts to the State to articulate a race-neutral reason for the strike. *Id.* At this second step, the focus of the inquiry is on the facial validity of the explanation; therefore, the State's reason will be deemed race-neutral unless discriminatory intent is inherent. *Id.* Finally, at the third step, if the State has established a race-neutral reason for the strike, the district court must determine whether the reason given was a pretext for purposeful discrimination. *Id.* In doing so, the district court may take into consideration whether the State's strike will result in the disproportionate exclusion of members of a certain race. *Id.* If the court ultimately determines that the State had a

discriminatory intent or motive for striking the prospective juror, the defendant is automatically entitled to a new trial. *Id.*

 Because the existence of racial discrimination in the exercise of a peremptory challenge is a factual determination, we give great deference to the district court's ruling and will not reverse unless it is clearly erroneous. *State v. Martin,* 773 N.W.2d 89, 101 (Minn.2009). A reviewing court affords great deference to the district court because "the record may not reflect all of the relevant circumstances that the court may consider." *Id.* (quoting *State v. Pendleton,* 725 N.W.2d 717, 724 (Minn.2007)) (internal quotation marks omitted).

## J.C.

 The State used its first peremptory strike to remove prospective juror J.C., an African American woman. J.C. is a nurse at the V.A. Medical Center. About 20 or 30 years earlier she testified as an alibi witness in her brother's assault trial. Her brother was convicted and served time in prison. Although J.C. testified that she respected the jury's verdict, she said she was "disappointed" with the decision and that it made her feel "sad." Although she said that she would be able to listen to the testimony and be impartial, she said the trial "will bring up memories of the past." The State asked her if she felt comfortable sitting in judgment of another person, and she replied, "Not completely.... I would have to—I would have to pray and ask for guidance to do the right thing." She further explained:

> What I'm saying is that I'm Christian and I'm no—you know, I'm not a bible scholar, but I know that in the bible it says, judge ye not, lest you be judged. But on the other hand, I feel that I can ask for guidance from God to—if God puts me in this position and I have to

make a decision, I would ask for guidance from God to make the right decision....

Following J.C.'s testimony, the State used one of its peremptory challenges to remove J.C. from the jury. Carridine made a *Batson* challenge to the State's peremptory challenge of potential juror J.C. The district court found that Carridine satisfied the first prong of *Batson* by showing a prima facie case of racial discrimination because the State asked more questions about race to J.C. than to other jurors. In response, the State offered the following reasons for its peremptory challenge of J.C.: (1) she was an alibi witness in a criminal case for a blood relative (her brother) in which she testified on his behalf as a defense witness; and (2) she had "some reservation and trepidation" regarding sitting in judgment of other people. The court accepted the State's reasons as race-neutral and made a specific finding that there was no purposeful discrimination on the part of the State in excluding potential juror J.C.

Regarding the State's first proffered reason for the peremptory strike, we have "consistently held that a family member's involvement with the legal system is a legitimate race-neutral reason for the State to exercise a peremptory challenge." *Martin,* 773 N.W.2d at 104 (citations omitted); *see State v. Reiners,* 664 N.W.2d 826, 832 (Minn.2003) (involvement of a prospective juror or a close family member in law enforcement is a race-neutral reason for challenge); *Greenleaf,* 591 N.W.2d at 501 (prospective juror's "sympathy for a brother in prison" was a race-neutral reason for challenge). J.C. served as an alibi witness in her brother's assault trial. Her brother was convicted and served time in prison. The State noted that J.C.'s "unique situation" would "have any prosecutor move to remove any potential juror regardless of

race under that scenario." The State further noted that J.C. was "saddened by [her brother's conviction] and ... can't necessarily not refer back to it ... in this process" and that "[e]ven when she was asked if the system worked fairly in her brother's case and she said [it] did, she hesitated and paused."

On appeal, Carridine claims that "[b]ecause a white juror [M.B.] ... had a family member involved in the criminal justice system" and was seated on the jury, the State's first reason for the peremptory challenge was a pretext for purposeful discrimination.[2] *See Walton v. Caspari,* 916 F.2d 1352, 1362 (8th Cir.1990) (holding that pretext may be established by proving that "prosecutors use[d] their peremptory challenges to exclude African–American venirepersons for a given reason or reasons, but then fail[ed] to apply the same reason or reasons to exclude similarly situated, white venirepersons"). We disagree.

The fact that M.B. was seated on the jury, when J.C. was not, does not establish pretext on the part of the State because J.C. and M.B. are not similarly situated. We have previously compared strikes of members of the panel who were allegedly similarly situated, and noted that differences between the members of the panel supported the conclusion that there was no pretext for the strike. *State v. Scott,* 493 N.W.2d 546, 549 (Minn.1992). J.C. and M.B. are not similarly situated because M.B.'s son's alleged violation, a DWI, which was reduced to reckless driving, was not a violent crime, whereas J.C.'s brother's charge was for a violent crime—assault. This case also involves a violent crime—murder. The Eighth Circuit has made similar distinctions. In *Elmahdi v.*

*Marriott Hotel Services, Inc.,* the Eighth Circuit concluded that the challenged juror, who served as a witness in a domestic abuse case, and the seated juror, who served as a witness in a contract dispute, were not similarly situated. 339 F.3d 645, 652 (8th Cir.2003) ("A juror who has personal involvement with domestic violence may be overly sensitive to issues of unwanted touching and harassment, whereas someone involved in a contract dispute would not.").

In addition to distinctions based on the type of violation, J.C. served as a witness in her brother's trial, whereas M.B. did not participate as a witness in his son's legal proceedings. Because we conclude that J.C. and M.B. are not similarly situated, we hold that *Walton* does not apply here.

Regarding the State's second reason for the peremptory strike, we have said that a prospective juror's "reluctance to sit in judgment" is a race-neutral reason for a peremptory strike. *State v. Gaitan,* 536 N.W.2d 11, 16 (Minn.1995); *see State v. Gomez,* 721 N.W.2d 871, 885 (Minn.2006) (peremptory strike based on prospective juror's expressed discomfort at deciding whether "to put someone away" and deciding another person's future was race-neutral). J.C.'s expressed reluctance to sit in judgment of others qualifies as a race-neutral explanation for the peremptory strike. She stated that she did not feel "completely" comfortable sitting in judgment of another person and that she would "have to pray and ask for guidance." She further explained that she was a Christian and referenced the biblical injunction "judge ye not, lest you be judged."

Carridine argues that the State's second proffered reason for the peremptory strike

---

**2.** M.B.'s son allegedly committed a DWI, but this charge was reduced to reckless driving. M.B.'s son spent a night in jail and hired a lawyer, but there is no indication that M.B. offered testimony or was otherwise involved in his son's proceedings.

was pretextual because the State did not exclude S.D., who is white, even though she expressed reluctance to sit in judgment of another person. *See Walton,* 916 F.2d at 1362. We disagree because we conclude that J.C. and S.D. are not similarly situated. S.D. stated that while she was initially concerned about sitting in judgment, she was "[d]efinitely confident in [herself] that [she] could be capable to make the decision." She stated:

> I think the ... initial concern really stemmed from more of a moral side, maybe just like the emotions within to ... essentially determine the fate of someone else. I think that's what was jarring. I mean, I make a lot of decisions every day, but, you know, they're on a much smaller scale.

While S.D. was initially concerned, after she had some time to reflect, she said that she "could be impartial" at the time of the voir dire, whereas J.C. did not feel "completely" comfortable judging others even at the time of the voir dire.

When the reasons offered by the State for its peremptory challenge of J.C. are considered together, they constitute a race-neutral explanation for the peremptory challenge. Neither S.D., nor M.B., nor any of the other prospective jurors in this case, demonstrated the combination of factors that J.C. did: J.C. was an alibi witness for her brother in a criminal case, involving a violent crime, in which her brother was convicted; and J.C. said she would not be "completely" comfortable sitting in judgment. *See United States v. Lewis,* 837 F.2d 415, 417 n. 5 (9th Cir.1988) ("We recognize, however, that the decision whether to strike a venireman hinges upon the interplay of various factors and that no unchallenged juror possessed all the cited characteristics."); *State v. Pullen,* 843 S.W.2d 360, 363 (Mo.1992) (finding reasons for peremptory strike were not pretextual

because although some of the other prospective jurors shared characteristics cited by the prosecutor, no other prospective juror possessed all of the characteristics that the prosecutor cited regarding the struck juror).

*P.G.*

The State used its second peremptory challenge to remove a prospective juror of color, P.G., who identified himself as an Asian–Pacific Islander. P.G. was unemployed and looking for work. The State asked P.G. how he would view the State's witnesses, who may have lifestyles that he does not particularly like, and P.G. responded that he would not judge them by their "nature of looks or how they sit" but would "look at the facts." When asked if the witnesses' prior bad acts would affect whether he believed their testimony, P.G. replied that he "would go by the weight of the facts."

■■■■ The district court initially denied Carridine's *Batson* challenge because he did not show a prima facie case. In attempting to establish a prima facie case, Carridine stated:

> [P.G.] is a person of color. He's an Asian–Pacific Islander, as stated on the questionnaire. His answers to the questions didn't vary from the answers that were given in response to questioning of the other jurors that have been accepted. This is also the second person of color that the State has used a peremptory on. I think the *prima facie* case is ... made, Your Honor.

In determining that Carridine did not show a prima facie case, the district court noted:

> I find that the questions that were asked of the prosecution and the defense to a certain extent have been rather consistent. Both of you have followed a pattern of questioning that hasn't varied a

great deal and there was no considerable variation on the part of the State. There were not extensive questions asked about this person's race or there were not matters that came up that could be tied to his race such that the two were ... somewhat wedded, as was the case with ... [J.C.].

... And so, I ... don't find that there has been a *prima facie* case established here and I am denying the *Batson* challenge.

We conclude that the district court did not clearly err in determining that Carridine failed to establish a prima facie case. Under the first prong of the *Batson* analysis, a prima facie case is established by showing (1) that a member of a racial minority has been peremptorily excluded and (2) that "circumstances of the case raise an inference that the exclusion was based on race." *State v. Everett,* 472 N.W.2d 864, 868 (Minn.1991) (citations omitted). By noting that there "were not extensive questions asked about [P.G.'s] race" or "matters that came up that could be tied to [P.G.'s] race," the district court did not clearly err in concluding that Carridine failed to establish a prima facie case.

■ Even if Carridine had established a prima facie case, the State offered an adequate explanation for the peremptory strike to defeat Carridine's *Batson* challenge. After initially denying Carridine's *Batson* challenge because he did not show a prima facie case, the court later asked the State to provide its reasons for removing P.G. The State's proffered reason for the peremptory challenge was P.G.'s hesitation in response to the prosecutor's questions about how he would treat the testimony of a witness who had "done something bad in the past." Carridine responded that P.G.'s answers were "consistent with the answers" of the Caucasian jurors who were not excluded through a

peremptory challenge by the State. Carridine also noted that the State exercised five peremptory challenges, and three of them were used on jurors of color.

■ A juror's "hesitancy" is a legitimate race-neutral, non-discriminatory reason for a peremptory strike. *See State v. Martin,* 614 N.W.2d 214, 223 (Minn.2000); *State v. Pendleton,* 725 N.W.2d 717, 724 (Minn.2007) ("We give great deference to the district court's ruling on a *Batson* challenge, recognizing that the record may not reflect all of the relevant circumstances that the court may consider." (citations omitted)); *see also State v. Logan,* 535 N.W.2d 320, 323 (Minn.1995) ("As a general rule, the trial court's resolution of the question whether the prospective juror's protestation of impartiality is believable is entitled to 'special deference' because 'the determination is essentially one of credibility, and therefore largely one of demeanor' " (citation omitted)). The district court concurred with the State that "there was some hesitation on [P.G.'s] part when asked the question about the past behavior of potential witnesses," although P.G. ultimately said that he would go by the weight of the facts. The court found that the explanation by the State that P.G. might pre-judge witnesses on the basis of their past behavior constituted a race-neutral explanation for removing him as a juror, and we conclude that the district court did not clearly err in making that determination.

We also conclude that the district court did not clearly err when it found that there was no pattern to the State's exercise of its peremptory challenges based on race. The court noted: there were other peremptory challenges of Caucasian prospective jurors the State had contemplated but did not ultimately make because Carridine had made for-cause challenges to those prospective jurors; P.G. was only the sec-

ond prospective juror that was struck by the State in exercising its peremptory challenges; after P.G. was struck, only one other person of color was struck by the State in exercising its peremptory challenges; and two jurors of color were ultimately seated on the jury. *See State v. Campbell*, 772 N.W.2d 858, 864 (Minn.App. 2009) ("The inference that the strike ... was part of a "pattern" of discrimination cannot be sustained because, according to the district court, Campbell's other peremptory strikes of nonwhites had valid, nonpretextual, race-neutral explanations.").

## II.

We turn next to Carridine's second claim, that the district court committed prejudicial error when it allowed Carridine to be impeached by his prior statement.

In determining whether the admission of evidence violates Minn. R. Evid. 410, we review a district court's findings of fact for clear error and review the court's legal conclusions de novo. *State v. Brown*, 792 N.W.2d 815, 821 (Minn.2011). "Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion." *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003) (citation omitted). Moreover, "[e]ven where the district court abuses its discretion, the court's evidentiary ruling will not be reversed unless the error substantially influenced the jury's verdict." *State v. Stone*, 784 N.W.2d 367, 370 (Minn. 2010) (citation omitted).

In order to understand Carridine's argument, it is necessary to review the procedural history of this case. In November 2008 Carridine pleaded guilty to second-degree intentional murder, and a sentencing hearing on the State's motion for an upward departure was scheduled. But before sentencing, Carridine made a motion to withdraw his guilty plea and attached a letter stating his reasons for doing so. In the letter, he discussed what happened on the night of the shooting and why he believed he had a self-defense claim. The district court issued an order granting the motion based on "[Carridine's] assertion that he is not guilty because of self-defense, the vagueness in the plea regarding the element of intent, and the differences between the state and the defendant concerning the facts of the case even after the plea."

At trial the State sought to use excerpts from Carridine's letter as statements by a party opponent. Ultimately, the district court allowed the State to cross-examine Carridine using statements he made in the letter but solely for the purpose of impeachment. During cross-examination, the State read the following statement from Carridine's letter and asked Carridine if he wrote it: "When I get to the mouth of the driveway, a car speeds up and hits me. As I'm diving, the car catches the lower part of my legs. I roll and hit the tree. When I stand up, the driver's door opened." Carridine conceded he wrote it and explained that the word "stand" was a grammatical error, and it should have said "when I'm standing up." Carridine contends allowing this statement to be used to cross-examine him violated Minn. R. Evid. 410 and that the error was prejudicial because it unfairly affected the jury's perception of Carridine's credibility.[3]

<hr>

3. Minnesota Rules of Evidence 410 provides: Evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil, criminal, or adminis-

We assume without deciding that the district court abused its discretion by admitting Carridine's prior statement for the purpose of impeachment but conclude that the admission of the prior statement did not substantially influence the jury's verdict and therefore, the error, if any, was not prejudicial. We begin by observing that Carridine's impeachment was minimal; put another way, the difference between "[w]hen I stand up" and "when I'm standing up" is so slight that it cannot be said to have substantially influenced the jury's verdict.

Additionally, the record in this case provides only minimal evidence supporting Carridine's self-defense claim. The record also reveals substantial evidence undercutting Carridine's self-defense claim even without Carridine's prior statement. For example, Guffie's girlfriend and White saw Carridine walk up to the car and heard him say something before shooting at the car. Bilbro did not see who was there but heard the shooter say something like, "get me some" or "pay me," saw a flash, ducked, and heard six or more gunshots. Guffie's girlfriend, Bilbro, and White denied having a gun, denied that Guffie had a gun, and denied that Guffie hit anyone with the car. J.J., the only eyewitness testifying on Carridine's behalf, could not say with certainty that he saw a gun. In light of the substantial evidence undercutting Carridine's self-defense claim, we conclude that the error in admitting Carridine's prior statement cannot be said to have substantially influenced the jury's verdict and, therefore, was not prejudicial.

### III.

We turn next to Carridine's third claim, that the district court committed prejudi-

cial error when it instructed the jury. Carridine asked the court to instruct the jury on justifiable taking of life, 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.05 (Supp.2011), but objected to the district court's instruction to the jury on the revival of the aggressor's right of self-defense, 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.07 (Supp.2011). Carridine now appeals both instructions.

▪ We review a district court's decision to give a requested jury instruction for an abuse of discretion. *See State v. Hall,* 722 N.W.2d 472, 477 (Minn.2006). Jury instructions, reviewed in their entirety, must fairly and adequately explain the law of the case. *State v. Flores,* 418 N.W.2d 150, 155 (Minn.1988). Under the invited error doctrine, a party cannot assert on appeal an error that he invited or that could have been prevented at the district court. *See State v. Goelz,* 743 N.W.2d 249, 258 (Minn.2007). The invited error doctrine does not apply, however, if an error meets the plain error test. *Id.* The plain error test gives us discretion to review unobjected-to errors if: (1) there is error, (2) the error is plain, and (3) the error affects substantial rights. *See id.* If the defendant establishes all three factors, we consider a fourth: "whether the error should be addressed 'to ensure fairness and the integrity of the judicial proceedings.'" *Id.* (quoting *State v. Reed,* 737 N.W.2d 572, 583 (Minn.2007)). When addressing the third prong of the plain error test, whether the error affected substantial rights, we ask whether the error was prejudicial and affected the outcome of the case. *State v. Griller,* 583 N.W.2d 736, 741

trative action, case, or proceeding whether offered for or against the person who made

the plea or offer.

(Minn.1998). We have said that the defendant bears the "heavy burden" of showing that any error was prejudicial. *State v. Burg,* 648 N.W.2d 673, 677 (Minn.2002). An erroneous jury instruction "is prejudicial if there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury verdict." *Gomez,* 721 N.W.2d at 880 (citation omitted).

#### A.

■ Carridine argues that the district court's instruction to the jury on justifiable taking of life, CRIMJIG 7.05, was plain error. We disagree. Although we conclude that the jury instructions on justifiable taking of life were given in error, we also conclude that Carridine has failed to establish that the instructions affected his substantial rights.

Carridine requested that the district court instruct the jury on justifiable taking of life, pursuant to CRIMJIG 7.05. The court granted the request and instructed the jury consistent with CRIMJIG 7.05:

> Justifiable taking of life in defense of self. No crime is committed when a person takes the life of another person, even intentionally, if the defendant's action was taken in resisting or preventing an offense the defendant reasonably believed exposed the defendant or another to death or great bodily harm.

> In order for a killing—a killing to be justified for this reason, four conditions must be met. First, the killing must have been done in the belief that it was necessary to avert death or great bodily harm.

> Second, the judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

> Third, the defendant's election to defend must have been such as a reasonable person would have made in light of the danger perceived and the existence of any alternative way of avoiding the peril.

> Fourth, there was no reasonable possibility of retreat to avoid the danger. All four conditions must be met.

> The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

On appeal, Carridine contends that giving the justifiable-taking-of-life instruction, CRIMJIG 7.05, was plain error and that he is entitled to a new trial.[4]

We have stated that when a defendant asserts self-defense and claims that the

---

4. On appeal, Carridine suggests that 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.06 (5th ed.2006) was the appropriate instruction to be given to the jury. CRIMJIG 7.06 provides:

> The defendant is not guilty of a crime if the defendant used reasonable force against _____ to resist (or to aid _____ in resisting) an offense against the person, and such an offense was being committed or the defendant reasonably believed that it was.
> It is lawful for a person, who is being assaulted and who has reasonable grounds to believe that bodily injury is about to be inflicted upon the person, to defend from an attack. In doing so, the person may use all force and means that the person reason-

ably believes to be necessary and that would appear to a reasonable person, in similar circumstances, to be necessary to prevent an injury that appears to be imminent.
> The kind and degree of force a person may lawfully use in self-defense is limited by what a reasonable person in the same situation would believe to be necessary. Any use of force beyond that, is regarded by the law as excessive.
> The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.
> (The rule of self-defense does not authorize one to seek revenge or to take into his or her own hands the punishment of an offender.)

resulting death was unintentional, it is inappropriate to give the justifiable-taking-of-life instruction in CRIMJIG 7.05. *See State v. Marquardt,* 496 N.W.2d 806, 806 & n. 1 (Minn.1993) (stating that if the defendant claims that he did not intend to kill the victim, then CRIMJIG 7.05 is inappropriate because it "improperly implies that the defendant must believe it necessary to kill in order for the killing to be justified"). Given our precedent, because Carridine testified that it "wasn't [his] intent to hit anyone" when he fired his gun, it was error for the district court to give jury instructions pursuant to CRIMJIG 7.05.

 Although the justifiable-taking-of-life jury instructions were given in error, we conclude that Carridine failed to establish that his substantial rights were affected by these instructions. The jury in this case was given clear instructions that to find Carridine guilty of first-degree premeditated murder, it must find that Carridine "acted with premeditation and with the intent to kill Lorenzo [ ] Guffie or another." The district court also explained to the jury that "[i]n order to have an intent to kill, the defendant must have acted with the purpose of causing death or the defendant must have believed that the act would have that result." By finding Carridine guilty of first-degree premeditated murder, the jury necessarily rejected Carridine's testimony that it "wasn't [his] intent to hit anyone"—a factual predicate to his argument regarding the CRIMJIG 7.05 instruction. We thus conclude that CRIMJIG 7.05's implication that "the defendant must believe it necessary to kill in order for the killing to be justified," *Marquardt,* 496 N.W.2d at 806 n. 1, did not affect the outcome of this case and therefore did not affect Carridine's substantial rights. We conclude that Carridine waived any error relating to the justifi-able-taking-of-life instructions because he invited the error and he failed to establish that the error satisfied the plain error exception to the invited-error doctrine.

## B.

Carridine also argues that the district court erred when it instructed the jury on the revival of the aggressor's right of self-defense, pursuant to CRIMJIG 7.07. Because we find substantial evidence in the record that Carridine was the initial aggressor, we disagree.

 District courts are entitled to considerable latitude when selecting language for jury instructions, but an instruction that materially misstates the law is error. *State v. Vance,* 734 N.W.2d 650, 656 (Minn. 2007).

 Over Carridine's objection, the district court instructed the jury on the revival of the aggressor's right of self-defense, pursuant to CRIMJIG 7.07:

> If the defendant began or induced the assault that led to the necessity of using force in the defendant's own defense, the right to stand the defendant's ground and thus defend himself is not immediately available to him. Instead, the defendant must first have declined to carry on the assault and have honestly tried to escape from it and must clearly and fairly have informed the adversary of a desire for peace and an abandonment of assault. Only after the defendant has done that will the law justify the defendant in thereafter standing his ground and using force against the other person. . . .

Carridine argues that the testimony was consistent with the conclusion that Guffie initiated the verbal argument inside the bar and appeared to be the aggressor during the argument outside the bar, making the revival instruction inappropriate. But

the court agreed with the State that "there are arguably several different starting points in which one can conclude either [Carridine] or [Guffie] was the initial aggressor inside the bar, outside the bar, at the point of contact ... with one another at the vehicle."

In *State v. Edwards,* we interpreted "began or induced the incident"[5] to contemplate conduct that is "a good deal greater than mere conversation" but did not define what is considered "more than conversation." 717 N.W.2d 405, 411–12 (Minn. 2006). In the instant case, there is substantial evidence suggesting that Carridine "began or induced the assault" through conduct that was "more than conversation." First, Carridine made several statements that indicated an intent to harm Guffie, including: he was "going to whoop one of their fucking asses"; telling bystanders, "Y'all better clear the street"; and saying he couldn't believe the "motherfucker" who robbed him was there and he didn't have his gun. Furthermore, the fact that Carridine left the bar shortly after Guffie (according to the bartender "[n]ot even a minute," and according to A.P. "[v]ery shortly after") and walked up to Guffie's car and started shooting is conduct that is "greater than mere conversation" and evidence that he was pursuing Guffie as the initial aggressor.

Carridine contends that even if he was somehow the aggressor in the verbal argument, Guffie's response to the non-physical verbal argument—hitting Carridine with his car and pulling a gun on him—was excessive, making the revival instruction misleading and confusing. *Id.* at 416–21 (Hanson, J., dissenting) (discussing the history of the revival instruction and not-

ing that the then-existing CRIMJIG 7.07 misstates the law because it does not account for proportionality, *i.e.,* if the defendant initiates an argument, that does not justify the victim in responding with deadly force). In *Edwards,* we noted that the Model Penal Code holds an initial aggressor " 'accountable for his original unlawful use of force but not for his defense against a disproportionate return of force by his victim.' " *Edwards,* 717 N.W.2d at 412 (citation omitted). But we declined to adopt this forfeiture rule, stating "we do not view the formulation of a forfeiture rule that focuses on the legal justification of a victim's response to the aggressor's acts as consistent with the policy choices of Minn. Stat. § 609.065." *Id.* (plurality opinion). Therefore, if a person begins or induces an assault that leads to the necessity of using force in that person's own defense, that person must attempt to retreat, regardless of whether the victim escalates the situation by using deadly force. There is no support in our case law for Carridine's claims, and we reject those claims here. We therefore hold that the district court did not abuse its discretion in instructing the jury in accordance with CRIMJIG 7.07.

### IV.

We now address Carridine's fourth claim, that the State committed prejudicial prosecutorial misconduct by (1) improperly using jury selection to inject racial and socio-economic considerations into the trial; (2) shifting the burden of proof to the defendant in its closing argument; (3) denigrating his defense theory; (4) denigrating his character; and (5) continuing to ask questions that the district court ruled

---

5. After our decision in *State v. Edwards,* 717 N.W.2d 405 (Minn.2006), CRIMJIG 7.07 was amended so that the word "assault" replaced the word "incident." 10 Minn. Dist. Judges

Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 7.07 cmt. (Supp. 2011).

improper. The only alleged prosecutorial misconduct that Carridine objected to at trial was the State's persistence in asking questions that the district court ruled improper.

■ With respect to allegations of unobjected-to prosecutorial misconduct, we apply a modified plain-error test. *See State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). Under this test, the defendant must establish both that the misconduct constitutes error and that the error was plain. *Id.* The defendant shows the error was plain "if the error contravenes case law, a rule, or a standard of conduct." *Id.* The burden then shifts to the State to demonstrate that the error did not affect the defendant's substantial rights. *Id.*

When reviewing objected-to alleged prosecutorial conduct, we have utilized a harmless-error test, the application of which varies based on the severity of the misconduct. *See id.* at 298, 299 n. 4 (discussing the two-tiered approach articulated in *State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974),[6] and "leav[ing] for another day the question of whether the *Caron* two-tiered approach should continue to apply to cases involving objected-to prosecutorial misconduct"). Because we conclude that the one instance of objected-to prosecutorial misconduct here is harmless even under the standard for more serious misconduct, we do not reach the issue of the continued applicability of the *Caron* test to objected-to prosecutorial misconduct.

**A.**

■ Carridine claims that the State improperly used jury selection to inject racial and socio-economic considerations into the trial by asking jurors questions about the lifestyle and appearance of witnesses. The State asked many prospective jurors a series of questions regarding the lifestyle, appearance, and prior misconduct of witnesses and asked if that would affect the juror's ability to analyze the witnesses' testimony. The State questioned potential jurors along the following lines:

Q If there was a witness who testified who you didn't approve of their lifestyle, was different than the way you think people should behave or live or how you behave or live, how would that affect your ability to be a juror?

A I'm not too judgmental about other people. If they're not doing anything that affects me, you know—

Q Okay. And, you know, if you heard that that person had done something wrong in the past or something, how would that affect your ability to judge their testimony in relationship to the facts of this case?

A I guess thinking of their testimony, if it contradicted somebody else, then that may weigh into it.

Q That may be a factor in your decision-making process?

A Yes.

Carridine relies on *State v. Clifton* and *State v. Ray* to support his argument. *State v. Clifton,* 701 N.W.2d 793 (Minn. 2005); *State v. Ray,* 659 N.W.2d 736

---

**6.** *Caron* sets out the two-tiered approach as follows:

[I]n cases involving unusually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming.... On the other hand, in cases

involving less serious prosecutorial misconduct this court has applied the test of whether the misconduct likely played a substantial part in influencing the jury to convict.

300 Minn. at 127–28, 218 N.W.2d at 200 (citations omitted).

(Minn.2003). We have held that it is misconduct for the State to invite the jury "to apply racial and socio-economic considerations" to a case. *Ray,* 659 N.W.2d at 747; *see also Clifton,* 701 N.W.2d at 799. The argument we concluded was improper in *Clifton* was as follows:

> I thought about you as jurors and how different your lives may be from the lives and the lifestyles of many of the people who testified before you and from the victim, Steven Nix.... It may be a different lifestyle and different world, but it's a world where many of the witnesses in this case reside. It's their reality.
>
> * * * *
>
> The witnesses who saw Steven Nix get murdered * * * deserve the same considerations as any other person, the same standards, the same rules, the same consideration. They [may] look different, they may perhaps sound different. Their lifestyles may be perhaps different, it doesn't matter.

701 N.W.2d at 799. Similarly, in *Ray,* the State used the closing argument to invite the jury to put the evidence "in context, particularly the type of people that presented this evidence to you." 659 N.W.2d at 746.

Unlike *Clifton* and *Ray,* in which improper comments were made by the State during closing argument, Carridine complains on appeal about questions the State asked during voir dire. The purpose of voir dire is different than the purpose of closing argument. The purpose of voir dire

> is to probe the jury for bias or partiality to enable counsel to exercise informed peremptory challenges and challenges for cause. The Constitution does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury. Nonetheless, the defen-

dant's right to an impartial jury is guaranteed, in part, by an adequate voir dire that permits the identification of unqualified jurors. The scope of voir dire is committed to the district court's sound discretion.

*State v. Gillespie,* 710 N.W.2d 289, 295 (Minn.App.2006) (citations omitted) (internal quotation marks omitted), *rev. denied* (Minn. May 16, 2006). "The court must allow the parties to conduct voir dire examination to discover grounds for challenges for cause and to assist in the exercise of peremptory challenges." Minn. R.Crim. P. 26.02, subd. 4(1). Under the Minnesota Rules of Criminal Procedure, a prospective juror may be challenged for cause on the existence of a state of mind on the part of the juror that "satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R.Crim. P. 26.02, subd. 5(1).

Because the State's questioning took place during voir dire and was aimed at selecting an impartial jury for a case in which many of the witnesses would be impeached with their criminal convictions and/or parole/probation status, we hold that the State's questioning was not improper and, therefore, did not constitute misconduct.

### B.

 Carridine argues that the State, in its closing argument, improperly shifted the burden of proof to him. In its closing argument, the State made the following statements:

> There is only one truth in this case.. Either Lorenzo Guffie had a gun or he did not have a gun. And the defendant wants you to believe he had a gun. Actually, I take that back. He needs you to believe he had a gun, not because it's true, because it's not. He needs you to

believe it because if you don't believe it, he's guilty of murder in the first degree. And so, he needs you to believe it.

. . . .

[T]he defense in this case is that somebody ran away with the gun, and they need you to believe that, because if not, the defendant is guilty of premeditated murder.

They need you to believe that Lorenzo Guffie had a gun. But Lorenzo Guffie laid there on the sidewalk bleeding to death no gun in hand, no gun in sight. . . .

But the defendant needs you to believe there was a gun. And in an effort to do so, in his cross-examination of Mr. White, he threw the Hail, Mary of criminal defenses. The desperation criminal defense pass, tried the Perry Mason moment.

. . . .

Throwing out a question, making a naked assertion, hoping for the Hail, Mary that's never caught is not a reasonable doubt.

Carridine contends that the State's comments suggested that Carridine had to prove that Guffie had a gun in order for the jury to find him not guilty. Arguments that shift the burden of proof to the defendant to prove his innocence are improper. *See State v. Whittaker,* 568 N.W.2d 440, 451–52 (Minn.1997); *State v. Gassler,* 505 N.W.2d 62, 69 (Minn.1993). But, as we noted in *Walsh:*

We look, however, at the closing argument as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence. *State v. Booker,* 348 N.W.2d 753, 755 (Minn.1984). Even if an argument is in some respects out-of-bounds, it is normally regarded as harmless error unless the misconduct played a substantial part in influencing the jury

to convict the defendant. *State v. Boitnott,* 443 N.W.2d 527, 534 (Minn.1989).

*State v. Walsh,* 495 N.W.2d 602, 607 (Minn. 1993).

The State did not shift the burden of proof to Carridine. Instead, the State was emphasizing the central question in this case, *i.e.,* whether Carridine acted in self-defense after Guffie allegedly pointed a gun at him. But even if we assume the State's comments improperly shifted the burden of proof to Carridine, the error did not affect Carridine's substantial rights under the plain error test. The jury was instructed on the presumption of innocence and the State's burden to prove the elements of the crime beyond a reasonable doubt. The district court also instructed the jury that the arguments or remarks of the attorneys are not evidence. Similarly, in *Whittaker,* we held that although the State's comments may have shifted the burden of proof to the defendant, there were no grounds for reversal, in part, because the jury was properly instructed on the presumption of innocence and the concept of proof beyond a reasonable doubt. *Whittaker,* 568 N.W.2d at 452.

We conclude that the State did not attempt to shift the burden of proof to Carridine but note that, even if it did, the error did not affect Carridine's substantial rights.

## C.

Carridine also argues that the State belittled his defense theory. In its closing argument, the State made the following remarks:

But the defendant needs you to believe there was a gun. And in an effort to do so, in his cross-examination of Mr. White, he threw the Hail, Mary of criminal defenses. The desperation criminal defense pass, tried the Perry Mason mo-

ment. . . . Throwing out a question, making a naked assertion, hoping for the Hail, Mary that's never caught is not a reasonable doubt.

Carridine claims the State was belittling or denigrating his defense in the abstract, rather than arguing that there was no merit to Carridine's "defense in view of the evidence," which he concedes the State has a right to do. The State has a right to vigorously argue its case, and it may argue in individual cases that the evidence does not support particular defenses. *State v. MacLennan*, 702 N.W.2d 219, 236 (Minn. 2005). Furthermore, the State's argument is not required to be colorless. *State v. Bolstad*, 686 N.W.2d 531, 544 (Minn.2004). But the State "may not belittle the defense, either in the abstract or by suggesting that the defendant raised the defense because it was the only defense that may be successful." *MacLennan*, 702 N.W.2d at 236.

In this case, the State did not belittle Carridine's claim of self-defense generally or suggest that the self-defense claim was raised only because Carridine had no other options. Instead, when the State's statements are viewed in context, it is apparent that the State was making arguments about the merits of Carridine's self-defense claim in this case. Carridine's counsel's cross-examination of White included the following exchanges:

Q And you would lie to the police or you would lie to this jury to protect yourself or Charles Bilbro from a gun charge, wouldn't you?

A No.

Q So you'd lie to protect him for a parole violation but you wouldn't lie to protect him if he was facing a gun count?

A No. What gun charge? What gun charge are you talking about?

Q The gun that was in the car.

A Who said there was a gun? Speculating.

. . . .

Q Okay. Is it because there wasn't any phone there? You picked a gun off the front seat?

A If you look at the camera, I mean, the-video, and you look at it closely, you will see a phone in my hand. You will see no gun.

Q Okay. Charles have a gun?

A No. Where is you getting this gun thing from?

. . . .

Q Therefore, what's the difference between your talking to the police at the scene and talking to the police at the hospital, however many minutes or hours it was later?

A It's a major difference.

Q Yeah, it allowed you to get rid of the gun, right?

A You speculating. I don't know where this come from. There was no gun.

Carridine's counsel repeatedly injected language about the possibility of White or his associates having a gun in his questioning of White, apparently hoping that White could substantiate the presence of a gun. The State specifically emphasized that the cross-examination of White was an indicator that there was a lack of evidentiary support for the self-defense claim. The State's statements in closing argument did not constitute misconduct.

### D.

Carridine also claims that the following exchange denigrated his character:

[State]: When Iisha Graddy came over, you told her you had shot somebody?

[Carridine]: That's hearsay.

[State]: We know you're well versed in the law, Mr. Carridine.

Even if we assume the State's unprompted, and probably irrelevant, characterization of Carridine's grasp of courtroom procedure was improper, the error was de minimis, and did not affect Carridine's substantial rights, and Carridine's claim is accordingly without merit.

### E.

Finally, Carridine objected to the State's persistence in asking questions that the district court ruled improper. When reviewing objected-to alleged prosecutorial misconduct, we have utilized a harmless-error test, the application of which varies based on the severity of the misconduct. In cases involving unusually serious prosecutorial misconduct, we require certainty beyond a reasonable doubt that the misconduct was harmless before we affirm. *Caron*, 300 Minn. at 127, 218 N.W.2d at 200. On the other hand, in cases involving less serious prosecutorial misconduct, we apply the test of whether the misconduct likely played a substantial part in influencing the jury to convict. *Id.* at 128, 218 N.W.2d at 200. Whether the *Caron* test should continue to apply to objected-to prosecutorial misconduct has been the subject of discussion in some of our recent decisions. *See State v. McCray*, 753 N.W.2d 746, 754 n. 2 (Minn.2008). Because we conclude that the prosecutorial misconduct is harmless even under the standard for more serious misconduct, we need not and do not reach the issue of the continued viability of the *Caron* test as applied to objected-to prosecutorial misconduct.

 During the trial, the State asked an FBI agent, "Do you have knowledge whether or not a person who's facing extradition can waive their right to fight extradition?" Carridine objected to this question, and the objection was sustained. Later, the State asked an investigator, "Are you aware whether or not extradition can be waived?" Carridine objected, and his objection was sustained on the ground of relevance. Finally, the State asked Carridine, "So did you legally fight [extradition] in Illinois?" Carridine responded that he fought extradition on the advice of counsel.

In *State v. Harris,* upon which Carridine relies, we stated, "Questions by a prosecutor calculated to elicit or insinuate inadmissible and highly prejudicial character evidence and which are asked in the face of a clear trial court prohibition are not tolerable." 521 N.W.2d 348, 354 (Minn. 1994) (holding that the State committed prejudicial misconduct by exposing the jury to two inadmissible prior bad acts). In this case, the State's questions were not designed to elicit highly prejudicial character evidence. The State's questions were brief, technical, and unrelated to Carridine's character or credibility. While the State's questioning, particularly in light of the district court's rulings, was improper, we conclude that the improper inquiries were harmless beyond a reasonable doubt.

In conclusion, we hold that the district court did not clearly err when it rejected appellant's challenges, alleging racial bias under *Batson* to the State's exercise of two peremptory challenges against persons of color during the jury selection process. We also hold that the admission of the appellant's prior statement did not substantially influence the jury's verdict and is therefore not prejudicial. Regarding jury instructions, we hold that the district court did not commit prejudicial error when it instructed the jury, at appellant's request, on the justifiable taking of human life because the error did not affect appellant's substantial rights. Because there was substantial evidence that appellant was the initial aggressor, we hold that the district court did not err when it instructed the

jury on the revival of the aggressor's right of self-defense. Finally, we hold that in the instances where there was or may have been prosecutorial misconduct, the misconduct was either harmless or did not affect Carridine's substantial rights.

Affirmed.