*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1274**

State of Minnesota,
Respondent,

vs.

George Matthews,
Appellant.

**Filed May 18, 2015
Affirmed
Stauber, Judge**

Hennepin County District Court
File No. 27-CR-13-40948

Lori Swanson, Minnesota Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, III, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Stauber, Presiding Judge; Bjorkman, Judge; and

Minge, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**STAUBER**, Judge

Appellant challenges his first-degree aggravated robbery conviction, arguing that the district court abused its discretion by admitting evidence of a 911 recording and that the prosecutor committed misconduct during closing argument by vouching for a witness. We affirm.

**FACTS**

On the morning of August 26, 2013, T.K.'s estranged girlfriend, A.M., noticed that T.K. was carrying a large amount of money and asked him for some. They argued when he would only give her money for their baby's diapers.

When T.K. returned to his apartment after work, he noticed a heavy-set black woman outside the secure door of his apartment building, "just staring at me the whole time I was walking towards the apartment." He went inside the apartment and set his wallet, which contained $6,700, on his bed. T.K. then heard a knock at the door, answered it, and the woman who had been staring at him asked to use his phone. While the door was open, appellant George Matthews and a six-foot tall "skinny" black man "bust[ed] in," the "skinny" man told T.K. that T.K. had something they wanted, and the "skinny" man physically attacked T.K. while appellant pointed a sawed-off shotgun at T.K. Appellant was known to T.K. because he is A.M.'s brother, and T.K. "clearly saw" appellant's face during the incident.

As the altercation between T.K. and the "skinny" man moved into the hallway and down the stairs, a woman who lived in the apartment below T.K.'s opened her door and

2

asked, "What's going on; everything ok?" T.K. tried to insert his hand in the woman's door, but she closed it. When appellant and the "skinny" man were leaving the building, appellant said to T.K., "If you come after us, I'm going to kill you." T.K. then went back to his apartment, and his money was missing.

During appellant's jury trial on a charge of first-degree aggravated robbery, the state introduced photos of T.K.'s injuries that were consistent with his testimony. Parts of T.K.'s description of the offense were also corroborated by the testimony of two apartment residents. The first, A.Y., a security guard, said that he saw two unfamiliar black men sitting at the back door of the apartment building when he drove up and an unfamiliar car parked in his assigned parking spot. He also saw a "bigger set" black woman whom he had never seen before sitting on the apartment stairs. This situation made him "nervous." Ten minutes later, A.Y. heard "a lot of thumps," and when he went outside after the incident, T.K. told him that he had been robbed by A.M.'s relatives.

The second witness, fourteen- or fifteen-year-old G.X., testified that she heard "loud noises," looked out the peephole of her apartment door, and saw two black men in the hallway, one of them holding the other in a headlock.

Officer Cody Turner and Detective Corinne Becker of the Brooklyn Center Police Department interviewed T.K. after the robbery. Both testified that T.K. identified appellant as one of the robbers.

Following a three-day jury trial, the jury convicted appellant of first-degree aggravated robbery. This appeal followed.

**D E C I S I O N**

*Admission of 911 Recording.*  Before trial, appellant asked the district court to exclude the recording of a 911 call made by an anonymous woman who lived in T.K.'s apartment building.  In the recording, the woman said that there was a "disturbance" at the address of T.K.'s apartment.  She then described hearing what she thought was someone falling down the apartment stairs, opening her door, seeing two African-American men fighting, one with his arm around the other's neck, and closing the door on one man's hand.  When the operator asked where police could find the men, the caller said, "Probably somewhere in the building unless they have gone out the door."  The caller could not describe the men's clothing and did not want to leave her name because she lived in the apartment building.  The district court allowed the recording to be played for the jury, ruling that the evidence was admissible under the excited-utterance exception to the hearsay rule.

Hearsay may be admissible under the excited-utterance exception if a declarant makes a statement that "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Minn. R. Evid. 803(2); *see State v. Edwards*, 485 N.W.2d 911, 914 (Minn. 1992) (setting forth elements of an excited utterances as "a startling event or condition," a statement that "relates to the event or condition," and "the statement is made under the stress caused by the event or condition").  "The rationale [for the exception] stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement."  *State v. Daniels*, 380 N.W.2d 777, 782

4

(Minn. 1986). There are "no strict temporal guidelines" for admission of an excited utterance, but it is usually allowed if the declarant made the statement while under the "aura of excitement" resulting from the event. *State v. Martin*, 614 N.W.2d 214, 223-24 (Minn. 2000) (quotations omitted).

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted). A defendant is not entitled to a new trial for erroneously admitted evidence "unless there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Asfeld*, 662 N.W.2d 534, 544 (Minn. 2003) (quotation omitted).

Appellant argues that the 911 recording should have been excluded because (1) it was unreliable, as there was no temporal connection established between the altercation and the 911 call and (2) the declarant was anonymous. We disagree and conclude that examination of the *Daniels* factors supports admission of the evidence. *See Daniels*, 380 N.W.2d at 782. The content of the 911 recording shows that the call was made within a very short time after the caller observed the altercation. The quick, clipped statements of the caller suggest nervousness and that the altercation occurred very recently. When the caller was asked where the two combatants were, she stated that they were "probably somewhere in the building unless they have gone out the door." From this statement, the district court could infer a close temporal connection between when the altercation

5

occurred and the caller dialed 911. *See State v. Hogetvedt*, 623 N.W.2d 909, 913 (Minn. App. 2001) (permitting victim's statements as excited utterances three hours after assault because it was "reasonable to conclude that [the victim] was still under stress from the incident" at that time), *review denied* (Minn. May 29, 2001); *see also Daniels*, 380 N.W.2d at 783 (stating that the "[l]apse of time between the startling event and the excited utterance is not always determinative"). The nature of the incident qualifies as a startling event, the statements appear reliable, and the conditions under which they were made demonstrate their trustworthiness.

As to the anonymity of the declarant, rule 803(2) does not specifically require that the declarant's identity be known, and appellant cites no Minnesota authority for this point. Minnesota law requires only that the statement be made while the declarant was under stress caused by the event or condition, which is satisfied here. *See id.* (requiring that excited utterance be "made [by the declarant] under the stress caused by the event or condition"); *compare Miller v. Keating*, 754 F.2d 507, 512 (3rd Cir. 1985) (holding that lower court erred by admitting an excited utterance of an unidentified declarant when there was no showing of personal knowledge or excitement on the part of the declarant), *with State v. Rawlings*, 402 N.W.2d 406, 408-10 (Iowa 1987) (upholding admission of statement of unknown declarant under theory that "personal knowledge of the facts . . . may be inferred from the utterance itself").

Finally, even if the district court abused its discretion by admitting the 911 evidence, this ruling did not significantly affect the verdict. Appellant was identified by T.K., who knew him and said that he "clearly saw" appellant's face during the incident.

*See State v. Thompson*, 414 N.W.2d 580, 583 (Minn. App. 1987) (stating that even observation of less than a minute at close range is "more than a fleeting opportunity for identification"), *review denied* (Minn. Jan. 15, 1988); *Caldwell v. State*, 347 N.W.2d 824, 828 (Minn. App. 1984) (stating that "[t]he Minnesota Supreme Court has consistently upheld convictions on the identification testimony of a single eyewitness").

*Prosecutorial misconduct*. Appellant next argues that the prosecutor committed misconduct during closing argument by vouching for T.K.'s credibility. Without objection, the prosecutor stated during her closing argument, "The state submits to you that [T.K.] seemed very believable and reasonable on the stand. [T.K.] seemed sincere."

When the defense does not object to prosecutorial misconduct, the standard of review applied is a modified plain-error test. *State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012). "Under this test, the defendant must establish both that the misconduct constitutes error and that the error was plain." *Id.* If the defendant meets this burden by showing a clear violation of law, the burden then shifts to the state to show that the error did not affect the defendant's substantial rights. *Id.* Whether this burden was met depends on the strength of evidence against the defendant, the pervasiveness of the misconduct, and the appellant's opportunity and efforts to rebut the improper conduct. *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007). Finally, "[i]f the state fails to demonstrate that substantial rights were not affected, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* (quotation omitted).

7

Generally, a prosecutor "may not offer a personal opinion as to the defendant's guilt" but may "offer[] an interpretation of the evidence." *State v. Bradford*, 618 N.W.2d 782, 799 (Minn. 2000). The prosecutor's statements constituted improper vouching for T.K. *See State v. Jackson*, 714 N.W.2d 681, 696 (Minn. 2006) ("A prosecutor may not personally endorse the credibility of a witness or impliedly guarantee a witness's truthfulness."); *State v. Swanson*, 707 N.W.2d 645, 656 (Minn. 2006) (holding that the statement "[T]he state believes [the witness] is very believable" constituted impermissible vouching); *but see State v. Anderson*, 720 N.W.2d 854, 864 (Minn. App. 2006) (holding that prosecutor's statement "I suggest that [the witness ] was a very credible witness" was "not [an] impermissible expression[] of opinion"), *aff'd*, 733 N.W.2d 128 (Minn. 2007).[1]

As in *Swanson*, the impermissible vouching used by the prosecutor here amounted to only a small part of the prosecutor's closing argument, the evidence against appellant was strong, and any error did not affect appellant's substantial rights. 707 N.W.2d at 656. While T.K. was a key state witness, there was no doubt about the reliability of his identification of appellant because he knew appellant and had a clear view of him at the time of the crime. Further, much of T.K.'s testimony was corroborated by other witnesses, including two persons who lived in the same apartment building and saw or

---

[1] Although the prosecutor in this case said that the defendant "seemed" believable and in *Swanson* the prosecutor said that the defendant "is" believable, the qualified language used here constitutes a personal endorsement of T.K.'s credibility.

heard aspects of the crime.  The state met its burden to show that the prosecutor's improper vouching did not prejudice appellant's substantial rights.

**Affirmed.**