*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0115**

In the Matter of the Welfare of:
P. J. K., Child

**Filed September 8, 2015
Affirmed
Chutich, Judge**

Mower County District Court
File No. 50-JV-14-2358, 2362, 2364

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Patrick Raymond McDermott, Blue Earth County Attorney, Susan B. DeVos, Assistant Blue Earth County Attorney, Mankato, Minnesota; and

Kristen M. Nelsen, Mower County Attorney, Austin, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Chutich, Judge; and Smith, Judge.

## U N P U B L I S H E D   O P I N I O N

**CHUTICH**, Judge

Appellant, fourteen-year-old P.J.K., robbed a pizza delivery driver at gunpoint. He was adjudicated as an extended jurisdiction juvenile for first-degree aggravated robbery, second-degree assault, and terroristic threats. On appeal P.J.K. argues that the district court erred (1) by allowing extensive hearsay testimony by police officers; (2) by

not providing an accomplice-corroboration instruction; (3) by allowing the state to refer to the complainant as a victim; and (4) by allowing the state to reference an accomplice's trial. P.J.K. further asserts that his rights under the Confrontation Clause were violated and that the prosecutor engaged in misconduct during her closing argument. He contends that the cumulative effect of these errors denied him his right to a fair trial. Because any errors committed by the district court were harmless and, even considered cumulatively, did not prejudice P.J.K., we affirm.

## FACTS

On March 12, 2014, H.F., a pizza delivery driver, was robbed at gunpoint in Mankato. As H.F. walked towards an apartment to make a delivery, two young males approached him from behind and one demanded H.F.'s money. One of the assailants, later identified by H.F. as P.J.K., held a gun to H.F.'s head and said he would "blow [H.F.'s] brains out." H.F. gave the assailants the money they demanded, they fled, and H.F. called 911.

Mankato Police Officer Bill Reinbold arrived first and spoke with H.F. about the attack. H.F. said the suspects were two young African-American males, one in a red hooded sweatshirt and the other in a gray or black hooded sweatshirt. The person wearing the red hooded sweatshirt held the gun to H.F.'s head.

Mankato Police Officer Steven Hoppe also responded to the reported armed robbery. While patrolling the area near the robbery, he saw people looking out of the window of a home at 317 East Spring Street. He turned on his spotlight and saw one African-American male before the shades quickly shut. The officer then approached the

2

home and spoke with a person living there, 17-year-old B.D. The officer asked B.D. if anyone suspicious was recently at his home, and B.D. said no.

Blue Earth County Sheriff's Deputy Jeremy Brennan helped search for the suspects. While patrolling the area, the deputy spotted a person wearing a red sweatshirt. The person ran when the deputy shined his spotlight on him. Deputy Brennan was unable to locate the person, but he relayed the information to other officers.

Officer Hoppe and another officer then returned to 317 East Spring Street. When they were in the alley behind the home, they saw P.J.K. and C.A. on the back porch. Officer Hoppe saw P.J.K. throw an object into a snowbank. Neither male was dressed for the cold weather and they appeared to be wet and cold. Police then searched the snowbank for the object that P.J.K. threw from the porch and found what looked like a semi-automatic pistol. It was actually a pellet gun.

Officer Reinbold returned to B.D.'s home and again spoke with B.D. B.D. acknowledged that P.J.K. and C.A. had been at his home that day playing video games. The boys left in the late afternoon, and then, around 11:00 p.m. or midnight, P.J.K. and C.A. returned to B.D.'s home and appeared "panicky." B.D. said that P.J.K. was wearing a red Polo-brand sweatshirt. P.J.K. and C.A. removed their clothing in B.D.'s home, and B.D. asked them to leave. Officers found a sweatshirt in B.D.'s house that matched the description of the red sweatshirt that P.J.K. was wearing.

The state filed a juvenile delinquency petition charging P.J.K. with first-degree aggravated robbery, second-degree assault, and terroristic threats. *See* Minn. Stat. §§ 609.245, subd. 1 (robbery), 609.222, subd. 1 (assault), 609.713, subd. 1 (terroristic

threats) (2014). The state then moved to designate the proceeding as an extended juvenile jurisdiction prosecution, and the district court granted the motion.

A two-day jury trial occurred in September 2014. The state called the investigating officers, B.D., and H.F. as witnesses. H.F. identified P.J.K. as the assailant who robbed him, and he positively identified the gun that P.J.K. threw in the snowbank as the weapon used that night. The defense objected numerous times during the officers' testimony, arguing that much of the testimony was hearsay. The defense also objected to a statement of C.A., elicited through B.D.'s testimony. The district court overruled the hearsay objections. The defense rested without calling any witnesses.

The jury convicted P.J.K. of all three offenses. P.J.K. was adjudicated delinquent and received a juvenile disposition and a stayed adult sentence. P.J.K. appeals.

### D E C I S I O N

### I. Hearsay Objections to the Officers' Testimony

P.J.K. contends that the district court committed prejudicial error by admitting (1) testimony from Officer Reinbold and Officer Hoppe about information they received from B.D. and H.F. during their investigation; (2) testimony from those same officers about the description of the suspects they received before beginning their investigation; and (3) testimony from Officer Brennan about a conversation he overheard concerning "people changing clothes."

"Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the trial court abused its discretion and that appellant was thereby

4

prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted). Prejudice occurs "when there is a reasonable possibility that without the error the verdict might have been more favorable to the defendant." *State v. Miller*, 754 N.W.2d 686, 700 (Minn. 2008) (quotation omitted).

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). Hearsay is not admissible unless it falls into an exception under the rules of evidence. Minn. R. Evid. 802.

**Testimony Concerning Statements of B.D. and H.F.**

P.J.K. argues that the district court committed prejudicial error by allowing Officer Reinbold and Officer Hoppe to testify about what B.D. and H.F. told them during their investigation before B.D. and H.F. were called to testify. The district court overruled the hearsay objections, explaining that because H.F. and B.D. were expected to testify later during trial and the officers were "giving credence to the accuracy of the statement[s]," the testimony was admissible.

The district court did not cite an evidentiary basis for its decision, but it appears that the district court may have relied on Rule 801(d)(1)(B) of the Minnesota Rules of Evidence. Rule 801(d)(1)(B) provides that a prior statement of a witness is not hearsay when certain circumstances are met. Under that rule, "a witness's prior statement that is consistent with his trial testimony is admissible as nonhearsay evidence if the statement is helpful to the trier of fact in evaluating the witness's credibility, and if the witness testifies at trial and is subject to cross-examination about the statement." *State v. Bakken*,

5

604 N.W.2d 106, 108–09 (Minn. App. 2000), *review denied* (Minn. Feb. 24, 2000). Before a prior consistent statement can be admitted, however, "the witness' credibility must have been challenged, and the statement must bolster the witness' credibility with respect to that aspect of the witness' credibility that was challenged." *Id.* at 109 (quoting *State v. Nunn*, 561 N.W.2d 902, 908–09 (Minn. 1997)).

Here, the district court noted that H.F. and B.D. were scheduled to testify as witnesses and would be subject to cross-examination if the defense deemed the officers' rendition of what the witnesses told them to be inaccurate. But the credibility of both H.F. and B.D. was not challenged before admission of the statements, as neither H.F. nor B.D. testified or were subject to cross-examination before the prior consistent statements were offered. In addition, P.J.K.'s counsel did not comment on or attack either witnesses' credibility in her opening statement. *See State v. Grecinger*, 569 N.W.2d 189, 193 (Minn. 1997) (providing that a victim's credibility can be attacked during opening statements).

A challenge of the witnesses' credibility is required by rule 801(d)(1)(B) before their prior consistent statements are admissible under the rule. *See State v. Farrah*, 735 N.W.2d 336, 344 (Minn. 2007) (requiring that the statement be helpful to the factfinder and explaining that "[t]o be helpful . . . , the witness's credibility must have been challenged"). The officers' testimony does not fall within the prior-consistent-statement exception, and the district court abused its discretion by admitting the statements when it did under rule 801(d)(1)(B).

6

Admission of the hearsay statements, however, did not prejudice P.J.K. *See Nunn*, 561 N.W.2d at 907 ("Reversal is warranted only when the error substantially influences the jury's decision."). The jury had the opportunity to hear testimony directly from H.F. and B.D., and their testimony was consistent in all material respects to what the officers previously relayed. H.F. testified about the events of March 12, identified P.J.K. as the assailant who threatened him with the gun, and identified the gun that P.J.K. threw in the snowbank. B.D. described P.J.K.'s actions that evening and the clothing that P.J.K. wore. Moreover, the prosecutor did not rely on the hearsay statements in her summation, but referenced the specific testimony of B.D. and H.F. We therefore conclude that, even if the district court erroneously admitted the hearsay portions of the officers' testimony, P.J.K. cannot show that he was prejudiced by the testimony.

**Testimony Concerning the Suspects' Physical Descriptions**

P.J.K. next contends that the district court erred in admitting Officer Reinbold's and Officer Hoppe's testimony concerning the physical description of the suspects that they received before arriving at the scene. Because the officers' testimony was not used to prove the truth of the matter asserted, but to show what information each officer relied upon in performing his investigation, it was not hearsay. *See* Minn. R. Evid. 801(c).

Appellant's reliance on *State v. Litzau*, 650 N.W.2d 177 (Minn. 2002) is unavailing. *Litzau* involved the disclosure of the contents of an unidentified informant's tip, a scenario that is not present here. Accordingly, the district court did not err in admitting the officers' statements concerning the physical description of the suspects they received when beginning their investigation.

7

**Officer Brennan's Testimony**

P.J.K. contends that the district court erred by allowing Officer Brennan to testify, over a hearsay objection, that when he entered the Spring Street residence, he heard "a conversation about people changing clothes." The district court overruled the objection, reasoning that because the conversation involved "[o]ther officers," it was admissible.

The hearsay statements of other officers, however, are not exempt from the rules of evidence. The officer's testimony regarding the conversation he overheard falls squarely into the hearsay definition. Because no exception applies, the district court abused its discretion in admitting this statement.

The record shows, however, that admission of this statement did not prejudice P.J.K. B.D. testified directly that P.J.K. and C.A. changed clothes after they returned to his house, and the police also testified that they found P.J.K. and C.A. on the back porch of B.D.'s house without adequate clothing for the weather. The officer's brief comment about "a conversation about people changing clothes" would not have influenced the jury in its decision to convict P.J.K.

## II. Confrontation Clause

P.J.K. argues that the district court violated his confrontation rights when it admitted the statement of C.A. through the testimony of B.D. The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Whether admitted testimony violates a defendant's confrontation rights is subject to a de novo standard of review. *State v. Blanche*, 696 N.W.2d 351, 366 (Minn. 2005). If evidence has been admitted in violation of the

8

Confrontation Clause, it is subject to harmless error analysis and does not require reversal "if the error was harmless beyond a reasonable doubt." *State v. Swaney*, 787 N.W.2d 541, 555 (Minn. 2010). "An error is harmless beyond a reasonable doubt if the guilty verdict actually rendered was surely unattributable to the error." *Id.* (quotation omitted).

Here, B.D. testified, over objection, that C.A. said that "whatever happened, I didn't do anything." After the state rested without calling C.A., the defense renewed its objection and requested a mistrial or, in the alternative, a judgment of acquittal, because it was unable to cross-examine C.A. The district court denied the motion because C.A. was in a conference room in the courthouse and was "available should [the defense] choose and decide to call him."

Because "the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court," *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S. Ct. 2527, 2540 (2009), the district court erroneously admitted C.A.'s statement through B.D.'s testimony. This error, however, is harmless beyond a reasonable doubt. The hearsay statement was a single reference in a two-day trial and could have been readily understood by the jury as C.A.'s attempt to exculpate himself and not to inculpate P.J.K. Moreover, the prosecutor did not reference C.A.'s statement in her closing argument, and the defense had an opportunity to counter the statement during its summation. Given the strong evidence of P.J.K.'s guilt, the jury's verdict was "surely unattributable" to C.A.'s single hearsay statement. *See Swaney*, 787 N.W.2d at 555.

### III. Accomplice-Corroboration Instruction

P.J.K. argues that the district court erred in not providing an accomplice-corroboration instruction after admitting C.A.'s single hearsay statement. Because he did not request or object to the omission of an instruction on accomplice testimony at trial, we review for plain error. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1980).

No error occurred here, plain or otherwise, when the district court did not sua sponte give an accomplice instruction. C.A. was never called by the state to testify against P.J.K. *See State v. Strommen*, 648 N.W.2d 681, 689 (Minn. 2002) (providing that an accomplice instruction be given "in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice"). And C.A.'s single hearsay statement – "whatever happened, I didn't do it" – did not explicitly implicate P.J.K.

### IV. Reference to Complainant as Victim

P.J.K. argues that whether someone was a victim of a crime is for the state to prove beyond a reasonable doubt. He asserts that by permitting the state to refer to H.F. as the victim during the trial, the district court improperly reduced the state's burden of proof. We disagree.

"The presumption of innocence is a fundamental component of a fair trial under our criminal justice system." *State v. Peterson*, 673 N.W.2d 482, 486 (Minn. 2004). This presumption is the "bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." *Id.* (quotation omitted). Accordingly, due process requires that the state bear the burden of proving each element

10

of an offense beyond a reasonable doubt, and that the burden of proof not shift to the defendant to prove his or her innocence. *Strommen*, 648 N.W.2d at 690.

Here, the state referred to H.F. as a victim five times during a trial with over 300 transcribed pages. The district court properly instructed the jury before trial began and at the close of trial that P.J.K. was presumed innocent of the charges against him, and that to find him guilty of the charges, the state had to prove his guilt beyond a reasonable doubt. Minnesota law "presume[s] that the jury follows the [district] court's instructions." *State v. Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005). Any inference the jury may have drawn from the use of the term "victim" in reference to H.F. was corrected by the instructions provided by the district court.

Moreover, the issue at trial was not whether an armed robbery of H.F. had actually occurred; rather, the factual issue was whether the state could prove beyond a reasonable doubt who committed it. In this context, an occasional reference to H.F. as a victim was accurate and not prejudicial. The district court did not err in allowing the state to refer to H.F. as the victim.

## V.    Reference to C.A.'s Trial

P.J.K. argues that the district court erred in allowing the state, over objection, to refer to C.A.'s trial. He asserts that evidence that C.A. had a separate trial is not relevant and is overly prejudicial. Under the circumstances present here, we cannot conclude that reference to C.A.'s trial was erroneous.

In its questioning of H.F., the defense asked whether the state or the police had him "look at" any other African-American males since the night of the offense. H.F.

11

responded, "No." On re-redirect, the prosecutor asked whether H.F. had "been called to testify with regard to this matter . . . in the case of a co-defendant." The prosecutor inquired about C.A.'s trial to allow H.F. to provide that he had, in fact, viewed other African-American males since the night of the offense, namely at the trial of C.A. Here, the defense opened the door to the question posed by the prosecutor. *See State v. Valtierra*, 718 N.W.2d 425, 436 (Minn. 2006) ("Opening the door occurs when one party by introducing certain material . . . creates in the opponent a right to respond with material that would otherwise have been inadmissible." (alteration in original) (quotation omitted)).

Moreover, we see no likelihood that the reference prejudiced P.J.K. After the prosecutor inquired about testifying in C.A.'s trial, no further reference was made about the substance of the trial. And, importantly, the jury never learned of the result of C.A.'s trial.

## VI. Prosecutorial Misconduct

P.J.K. argues that prosecutorial misconduct deprived him of a fair trial. He contends that the prosecutor engaged in misconduct during her closing argument when she (1) argued her personal opinions to the jury and (2) impermissibly vouched for the victim's credibility.

When analyzing objected-to prosecutorial misconduct, we apply a harmless error test that depends on the seriousness of the misconduct. *State v. Carridine*, 812 N.W.2d 130, 150 (Minn. 2012). We evaluate whether the misconduct "likely played a substantial part in influencing the jury to convict" in cases involving less-serious prosecutorial

misconduct. *Id.* For cases involving "unusually serious" prosecutorial misconduct, we consider whether it is "certain[] beyond a reasonable doubt that the misconduct was harmless." *Id.* We review unobjected-to prosecutorial misconduct under a modified plain-error analysis. *State v. Ramey*, 721 N.W.2d 294, 299 (Minn. 2006).

We consider "the closing argument as a whole, rather than just selective phrases or remarks" when reviewing claims of prosecutorial misconduct. *State v. Walsh*, 495 N.W.2d 602, 607 (Minn. 1993). We address each alleged statement of misconduct in turn.

**Statement One:**

In her closing argument, the prosecutor stated:

> During the jury selection process, um there was some discussion about CSI and – a very popular show and while that's certainly an interesting show and entertaining um, I'm here to tell you today, that there is a difference between CSI and reality. In a perfect world, every Officer would have more than enough time to devote to each and every single service call they receive and if resources were endless and time was no issue, every single article or piece of evidence received by the State or collected, would be extensively examined by forensic scientists. That's just not the world that we live in.
>
> Would a voice line-up done with . . . the Domino's employee who took the call or [H.F.] have provided us with any additional information that we need to know in this case? Possibly. Possibly not. Would it have been a lengthy expensive process? Likely.

While it is misconduct for a prosecutor to state her personal opinion in her argument to the jury, *see Blanche*, 696 N.W.2d at 375, the prosecutor's opinion concerning the "likely" expense of testing certain evidence was not error. This portion of

13

the prosecutor's closing argument was a legitimate response to the defense's attack on the failure of investigators to perform a thorough and complete investigation, and an attempt to counter the high evidentiary expectations of jurors who watch forensic crime shows on television. It is not misconduct for the prosecutor to rebut the defense's argument and provide an alternative explanation for the jury to consider.

**Statement Two:**

The prosecutor, in closing, also stated:

> Upon receiving this – this case, when my office made the request to receive those photos,[1] it was learned that those photos were unable to be located. Would we have liked to have seen them? Certainly. Were those photos a critical piece of information that affected the charging decision and would have possibly made our office to decide to not to move forward with this case? Absolutely not.

The district court overruled the defense's objection.

P.J.K. argues that it was misconduct and irrelevant for the prosecutor to refer "to what information she may have used in her charging decision." We agree that this reference was inappropriate. But if the prosecutor had framed the question as to whether the loss of these photos created a reasonable doubt as to P.J.K.'s guilt, the argument is proper.

Considering the record before us and the entirety of the prosecutor's closing statement, this reference to charging was harmless. *See Walsh*, 495 N.W.2d at 607 ("Even if an argument is in some respects out-of-bounds, it is normally regarded as harmless error unless the misconduct played a substantial part in influencing the jury to

---

[1] The photos referred to are photos of the pellet gun lying in the snowbank.

14

convict."). The eleven transcribed pages of the prosecutor's closing argument primarily focused on emphasizing the testimony of the officers, the victim, and B.D. Here, the prosecutor was rebutting the defense's loss-of-evidence claim and arguing that the photos were not necessary to prove that P.J.K. committed the charged offenses. The evidence presented at trial was sufficient to support P.J.K.'s guilt, and this statement would not have played a substantial part in influencing the jury to convict him.

**Statement Three:**

The prosecutor continued her closing argument by stating:

> Would a photo – a photo line-up done with [H.F.] have provided us with any additional information? Possibly. You had an opportunity to hear in his own words today and he had an opportunity to tell you who robbed him.
>
> Would fingerprint testing – an analysis of the weapon determined if [P.J.K.] – ah – would fingerprint testing or analysis of the weapon to determine if [P.J.K.] had touched the particular weapon that has been admitted as an Exhibit give us any new information? Or, would it tell us anything that we didn't already have evidence of? It may have indicated that additional people had touched that weapon, but it wouldn't have changed the fact that we already have evidence that [P.J.K.] did touch the weapon.

The defense did not object to these statements; on appeal, P.J.K. contends that they "amplified" the prosecutor's misconduct.

We find no error or misconduct here. In the context of the entire closing argument, the statements were an effort to focus the jury's attention on the evidence presented at trial and not on investigative acts that the police did not do. The prosecutor

was appropriately contending that the state had sufficient evidence to prove that P.J.K. used the weapon to rob H.F.

**Statement Four**

P.J.K. next asserts that the prosecutor improperly vouched for the victim's credibility when she made the following statements:

> [H.F.] sat here before you without hesitation and told you that [P.J.K.] is the individual who robbed him at gunpoint. You also heard that since this robbery, he's had an opportunity to be in the presence of another individual who is also a suspect in this matter. At that time he was asked if he could identify that person. He was very honest in saying, he couldn't definitively ID that other person as a suspect as either the person in the red sweatshirt or the other individual who was with the person in the red sweatshirt wearing a darker colored sweatshirt possibly blue or gray. He didn't simply say "yes" in that case because the person before him was a young African American male. [H.F.] also identified the weapon that was used in the robbery against him – the Exhibit that you will get to examine in the court – in the deliberation room. He identified that Exhibit as the same gun that was used against him in the robbery.

The defense did not object at trial.

Impermissible vouching occurs "when the government implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Lopez-Rios*, 669 N.W.2d 603, 614 (Minn. 2003) (quotation omitted). While a prosecutor "may not throw onto the scales of credibility the weight of [her] own personal opinion," *State v. Ture*, 353 N.W.2d 502, 516 (Minn. 1984), she "may argue that particular witnesses were or were not credible," *Lopez-Rios*, 669 N.W.2d at 614.

16

Here, the prosecutor did not guarantee the victim's truthfulness, refer to facts outside of the record, or express a personal opinion as to the victim's credibility. *See id.* Rather, the prosecutor was rebutting the defense's assertions that the pellet gun was not the gun used in the armed robbery and that the victim's eyewitness identification was inaccurate. Nor did the prosecutor err when she said that the victim was being "honest." Rather, she was appropriately contending that his admission that he could *not* identify the second person involved in the robbery made him a credible witness.

### VII.    Cumulative Effect of Alleged Errors and Misconduct

P.J.K. argues that the aggregation of the alleged errors and misconduct demonstrates that he did not receive a fair trial. A defendant is deprived of a procedurally fair trial when "the number of errors and the seriousness of some of them" render us "unable to determine whether the jury based its verdict on the admissible evidence and the reasonable inferences derived therefrom." *State v. Mayhorn*, 720 N.W.2d 776, 792 (Minn. 2006). "Cumulative error exists when the cumulative effect of the . . . errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury." *State v. Penkaty*, 708 N.W.2d 185, 200 (Minn. 2006) (alteration in original) (quotation omitted).

Applying this standard here, we conclude that none of these errors was serious enough, even considered cumulatively, to prejudice P.J.K. While P.J.K.'s trial was not perfect, he received a fair trial.

**Affirmed.**

17