*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0155**

State of Minnesota,
Respondent,

vs.

David Francis Chamberlain,
Appellant.

**Filed February 14, 2024**
**Affirmed**
**Smith, John, Judge**[*]

Hennepin County District Court
File No. 27-CR-21-11260

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Larson, Judge; and Smith, John, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**SMITH, JOHN**, Judge

We affirm appellant's conviction of second-degree felony murder because appellant does not meet his burden to show that the prosecutor's reason for striking a juror was race-based and because the prosecutor did not engage in prejudicial misconduct during cross-examination or closing argument.

## FACTS

In June 2021, respondent State of Minnesota charged appellant David Francis Chamberlain with one count of first-degree arson following a residential house fire that injured two people, D.S. and L.S. *See* Minn. Stat. § 609.561, subd. 1 (2020) (criminalizing first-degree arson of a dwelling). The state later amended the complaint to add one count of second-degree felony murder after D.S. died from complications due to injuries from the fire. *See* Minn. Stat. § 609.19, subd. 2(1) (2020) (criminalizing second-degree felony murder). Chamberlain entered a plea of not guilty, and the matter was scheduled for trial.

The parties proceeded with jury selection.[1] Following voir dire, the prosecutor exercised a peremptory strike of prospective juror L.M. Chamberlain raised a *Batson* challenge, arguing that the state's peremptory strike was unlawful because L.M. is Black and because L.M. did not say anything during questioning that should have disqualified him from serving as a juror. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that

---

[1] The following factual summary is based on the evidence and testimony presented at trial.

the Equal Protection Clause of the United States Constitution prevents parties from striking prospective jurors based solely on their race).

The district court denied Chamberlain's *Batson* challenge, stating that Chamberlain failed to make a prima facie showing that the state exercised the strike on the basis of race.

At trial, the expert witness testimony centered around the intent requirement of arson. *See* Minn. Stat. § 609.561, subd. 1 ("Whoever unlawfully by means of fire or explosives, *intentionally destroys or damages any building that is used as a dwelling* at the time the act is committed . . . commits arson in the first degree . . . ." (emphasis added)). Several experts, including an investigator with the Minneapolis Fire Department and a deputy investigator with the Minnesota State Fire Marshal, testified for the state as to the cause of the fire. Their testimony established that, based on their review of the scene, the fire started in a chair on the first-floor porch, and "[w]ith the totality of the information, the witness statements, the fire patterns, [and] the fire dynamics," the fire was "intentionally set."

Chamberlain had one expert witness testify, a professor who was a professional fire and explosion investigator from Kentucky. The expert noted that he was "concern[ed] with . . . the conclusions that were being reached [by the state's experts] . . . [and] the lack of evidence that supported" the conclusion that the fire was "incendiary." More specifically, the expert testified that the state's experts did not follow the scientific method, and he challenged the state's experts' conclusion that the fire was intentionally started in a chair on the porch.

3

The jury found Chamberlain guilty on both counts and the district court entered a conviction for second-degree felony murder. The district court also granted the state's motion for an upward departure and sentenced Chamberlain to a 360-month executed prison sentence. Chamberlain appeals.

## DECISION

### I.

Chamberlain argues that the district court erred by denying his objection to the state's peremptory challenge to a Black prospective juror. A party may use a peremptory challenge "to strike a prospective juror that the party believes will be less fair than some others" in an effort "to select as final jurors the persons they believe will be most fair." *State v. Martin*, 773 N.W.2d 89, 100 (Minn. 2009) (quotation omitted). But a party may not use a peremptory challenge to strike a prospective juror based on race, as doing so violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV, § 1; *Batson*, 476 U.S. at 84; *see also State v. Carridine*, 812 N.W.2d 130, 136-37 (Minn. 2012) (applying *Batson*).

Minnesota courts use the three-step framework set forth in *Batson* to determine whether racial discrimination motivated the peremptory challenge. *Martin*, 773 N.W.2d at 101; *see also* Minn. R. Crim. P. 26.02, subd. 7(3) (adopting the *Batson* three-step process). Under this framework,

> (1) the defendant must make a prima facie showing that the prosecutor executed a peremptory challenge on the basis of race; (2) the burden then shifts to the prosecution to articulate a race-neutral explanation for striking the juror in question; and

4

> (3) the district court must determine whether the defendant has carried the burden of proving purposeful discrimination.

*Martin*, 773 N.W.2d at 101. It is important for the district court to clearly demarcate and "announce on the record its analysis of each of the three steps of the *Batson* analysis." *State v. Reiners*, 664 N.W.2d 826, 832 (Minn. 2003).

The existence of racial discrimination in the use of a peremptory challenge is a factual determination. *State v. Diggins*, 836 N.W.2d 349, 355 (Minn. 2013). An appellate court gives "great deference to the district court's [*Batson*] ruling and will uphold the ruling unless it is clearly erroneous." *Id.* (quotation omitted); *State v. White*, 684 N.W.2d 500, 507 (Minn. 2004) ("[U]pon review of a district court's determination under step one of the *Batson* process that a prima facie showing of discrimination has not been established, we will reverse only in the face of clear error."). This deference recognizes "that the record may not reflect all of the relevant circumstances that the court may consider." *State v. Pendleton*, 725 N.W.2d 717, 724 (Minn. 2007).

During voir dire, Chamberlain objected to the state's peremptory challenge to venire member L.M., who is Black. Chamberlain's counsel noted that nothing L.M. said during questioning would "make a basis for exercising a peremptory strike," thus raising the inference that the state's strike was based on race. The district court denied the request, finding that Chamberlain had failed to make a prima facie showing at the first step. The district court stated that Chamberlain did not show that the motive for the strike was based on L.M.'s race, explaining:

> So, although I do understand and respect the—*and, frankly, agree [that L.M.] strikes me as a perfectly satisfactory*

*juror*—but preemptive strikes inherently eliminate . . . [and] by definition exclude people who, in another person's eyes . . . would be *perfectly reasonable jurors*. And so that by itself I am going to find is not sufficient to constitute a prima facie case in this instance.

(Emphasis added.) The district court further explained that the jury panel had "a number of people of color on it" and was "more proportional" than the district court was "used to seeing."

After the district court explained its ruling, the prosecutor provided a race-neutral explanation, "just in case [the] appellate court were to disagree with [the district court's] analysis on the first step." The district court responded, "All right," and made no further findings concerning either the second or third step.

Chamberlain argues that the district court erred by ruling that he did not establish a prima-facie case and asks this court to remand the case to the district court to address steps two and three of the *Batson* analysis.

"The defendant's burden to establish a prima-facie case is low; a defendant need only 'produce evidence sufficient to permit the [district court] judge to draw an inference that discrimination has occurred.'" *State v. Black*, 919 N.W.2d 704, 711 (Minn. App. 2018) (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005)). To make a prima facie case of discrimination, the challenging party must show two things: "(1) that a member of a racial minority has been peremptorily excluded and (2) that circumstances of the case raise an inference that the exclusion was based on race." *Reiners*, 664 N.W.2d at 831 (emphasis omitted) (quotation omitted). "[T]he fact that the prospective juror is a member of a racial minority, alone, does not raise an inference that the exclusion was based on

6

race." *Black*, 919 N.W.2d at 711 (quotation omitted); *see also State v. Onyelobi*, 879 N.W.2d 334, 345 (Minn. 2016) ("It is well-settled that mere removal of a member of a racial minority does not necessarily establish a prima facie case of discrimination." (quotation omitted)). "[A] prima-facie showing is based on the 'totality of the relevant facts' regarding the proponent's conduct during the trial." *Black*, 919 N.W.2d at 711 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)). Additionally, the supreme court stated:

> The inference of discrimination can be drawn by proof of disproportionate impact upon the racial group, *e.g.*, the prosecutor totally excluded all [Black people] from the venire, or upon an examination of all the surrounding circumstances, *e.g.*, an examination of the prosecutor's questions in voir dire or stated reasons in exercising peremptory challenges . . . .

*State v. Moore*, 438 N.W.2d 101, 107 (Minn. 1989).

Neither party challenges the first requirement—that L.M. is a member of a racial minority—L.M. is Black. But for the reasons that follow, we disagree that Chamberlain met his burden to show that the state engaged in prima facie discrimination because the circumstances of the case do not "raise an inference that the exclusion was based on race." *Reiners*, 664 N.W.2d at 831 (quotation omitted).

Chamberlain argues that the district court erred at the second requirement because "the peremptory strike could not be based on the words [that] L.M. spoke, [so] it's reasonable to infer [that] it was based on the color of his skin." Chamberlain relies on the district court's statement that L.M. "strikes [the district court] as a perfectly satisfactory juror" as establishing an inference of discrimination. The state contends that it is

"irrelevant" as to whether L.M. could be a satisfactory juror because "peremptory challenges are designed to excuse jurors who can be fair but are otherwise unsatisfactory to the challenging party."

In *Reiners*, the supreme court explained that "[p]eremptory challenges are designed to be used to excuse prospective jurors who can be fair but are otherwise unsatisfactory to the challenging party." 664 N.W.2d at 833. Chamberlain does not point to any facts in the record that raise an inference of discrimination; rather, he argues that the absence of facts showing a motivation to strike creates the inference. And Chamberlain does not cite any Minnesota caselaw stating that the absence of facts showing a motivation to strike leads to an inference of discrimination. Accordingly, just because the district court stated that L.M. could be "a perfectly satisfactory juror," it does not raise an inference of discrimination.

Chamberlain also argues that the district court erred because it "suggest[ed] that Chamberlain failed to make a prima facie showing because the state did not strike *all* 'people of color' from the panel."

An inference of racial discrimination can be drawn upon "proof of disproportionate impact upon the racial group, [such as when] the prosecutor *totally excluded* all [Black people] from the venire." *Moore*, 438 N.W.2d at 107 (emphasis added). It is proper to consider whether a person of color was already seated on the jury at the first step of the *Batson* analysis. *State v. Harvey*, 932 N.W.2d 792, 815 (Minn. 2019); *see also White*, 684 N.W.2d at 507 (concluding that the defendant had not established a prima facie case in part because a Native American woman with a Black husband "had already been accepted as a juror").

8

Here, the district court explained that the venire panel had "a number of people of color on it," the prosecutor did not exclude "the only person of color on the panel," and the jury was "more proportional" than the judge had seen in other cases. Accordingly, the district court appropriately considered whether the prosecutor had excluded all other people of color.

In sum, on this record, and in light of the district court's opportunity to assess prima facie cases of discrimination, we affirm the district court's denial of the *Batson* challenge to the peremptory strike of L.M.

## II.

Chamberlain argues that he is entitled to a new trial because the prosecutor engaged in misconduct during cross-examination and closing arguments. "The prosecutor is an officer of the court charged with the affirmative obligation to achieve justice and fair adjudication, not merely convictions." *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007).

Chamberlain did not object to the prosecutor's questions during cross-examination or during closing argument. Unobjected-to claims of prosecutorial misconduct are reviewed under a modified plain-error standard. *State v. Epps*, 964 N.W.2d 419, 423 (Minn. 2021). Under a traditional plain-error analysis, the defendant must establish (1) an error, (2) that is plain, and (3) that affected his or her substantial rights. *State v. Ramey*, 721 N.W.2d 294, 298-99 (Minn. 2006). An error is plain if it is clear or obvious, and usually this is shown if the error violates caselaw, a rule, or a standard of conduct. *Id.* at 302. If the three plain-error prongs are satisfied, we then determine whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings. *Id.* at

9

298. Under the modified approach, if a defendant shows the existence of an error that was plain, the burden shifts to the state to show that the plain error did not affect the defendant's substantial rights. *Id.* at 300-02.

Chamberlain first argues that the prosecutor committed plain error because "a prosecutor may not suggest that the testimony of a defendant's expert witness is attributable to the payment of money" during either cross-examination or in closing argument.

The state and Chamberlain both provided expert witness testimony concerning the fire. A key issue at trial involved whether the state proved that the fire was "intentionally" set to meet the element for arson. *See* Minn. Stat. § 609.561, subd. 1 (requiring the defendant to "intentionally destroy[] . . . any building that is used as a dwelling at the time the act is committed" for first-degree arson of a dwelling).

The state presented expert witness testimony from the Minneapolis Fire Department and State Fire Marshal. A Minneapolis Fire Department investigator responded to the fire at the duplex and presented his observations about the origin of the fire. As required by the national guidelines, he ruled out other possibilities of the cause of the fire. He explained that the evidence was consistent with an open flame being the source. He testified, "[w]ith the totality of the information, the witness statements, the fire patterns, [and] the fire dynamics, . . . this was an intentionally set fire." Another investigator with the State Fire Marshal also testified that the fire was "intentionally set."

Chamberlain called Gregory Gorbett, who owns a fire and explosion investigation company and is a university professor in Kentucky. Gorbett reviewed the information, which included photographs and reports. He agreed that the fire likely started in the general

10

area of the porch but disagreed that it started on a chair and that the fire was intentional, providing several alternatives for the source of the fire. Based on those alternatives, he concluded that the cause of the fire should have been "undetermined."

Chamberlain challenges the prosecutor's questioning during cross-examination that Gorbett:

- testified "on a retained, paid basis";
- earned an hourly rate for work on the case outside of the courtroom;
- earned $225 per hour;
- was paid for his lodging and travel expenses;
- traveled by airplane from Kentucky to testify; and
- stayed in a hotel while in Minnesota, which was "covered."

Chamberlain also challenges the prosecutor's statements during closing argument relating to Gorbett's compensation:

- "The standard in an American courtroom is not, can the . . . defense attorney and an expert *who's been paid to testify for a defendant* come up with an alternative theory of the case? That's—that's not the standard."
- L.S. was "not a practiced witness *that gets paid $225 an hour* to, you know, come in and . . . dazzle juries."
- The prosecutor stated that Gorbett's testimony was "speculation by an expert *who's been flown in from Kentucky*."

(Emphasis added.)

Finally, Chamberlain argues that the prosecutor committed misconduct in "closing argument by making arguments not supported by the evidence to bolster the credibility of [K.J.,] a critical state witness." Specifically, Chamberlain challenges the prosecutor's statement that:

> [K.J.] testified as well, and he certainly isn't a polished witness, either. He got aggravated with the [d]efense attorney's questions. *Frankly—you didn't necessarily see in*

*the courtroom, but he—you know, not a huge fan of mine, either. Because, sometimes, he doesn't like being asked questions that he thinks are stupid. He doesn't like being asked questions that he thinks are repetitive or—he doesn't understand why it's important.*

*But, just like [L.S., the other state's witness], he testified to all the important events.*

(Emphasis added.)

Ultimately, we need not determine whether the prosecutor's statements in this case constitute plain error because we are satisfied that the alleged error did not affect Chamberlain's substantial rights. *See State v. Moore*, 863 N.W.2d 111, 119 (Minn. App. 2015) ("If an appellate court concludes that any requirement of the plain-error test is not satisfied, the appellate court need not consider the other requirements."), *rev. denied* (Minn. July 21, 2015). In making that determination, we consider the strength of the evidence against Chamberlain, the pervasiveness of the erroneous conduct, and whether Chamberlain had an opportunity to rebut any improper remarks. *State v. Peltier*, 874 N.W.2d 792, 805-06 (Minn. 2016). When reviewing a prosecutor's closing arguments, we "review the closing argument as a whole." *State v. Cao*, 788 N.W.2d 710, 717 (Minn. 2010); *see also State v. Walsh*, 495 N.W.2d 602, 607 (Minn. 1993) (noting that courts look at the state's closing argument "as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence").

First, the state argues that the evidence against Chamberlain was "strong." The evidence includes testimony that Chamberlain had multiple conflicts with the residents of the duplex in the days leading up to the fire and that shortly before the day of the fire, Chamberlain threatened to "burn this mother-cker down." The state further notes that on

the day of the fire, L.S. testified that he saw Chamberlain walking near the duplex, and K.J. testified that he heard Chamberlain's voice at the door by the porch. And when K.J. and L.S. went to the porch, they saw a chair on fire. Furthermore, the state highlights its fire investigators' testimony concluding that the fire was intentionally set on the back porch and was consistent with an open flame, which was consistent with K.J. and L.S.'s description of seeing a chair on the porch on fire.

The state explains that the prosecutor's comments on cross-examination were brief "when viewed in the context of the entire cross," and "brief in light of the amount of time the prosecutor spent talking about Gorbett's investigation and conclusions." And any statements involving the witness, K.J., during closing argument were "very brief in the context of the entire closing argument."

The state also notes that Chamberlain's counsel had an opportunity to rebut any alleged misconduct during closing argument when it responded to the state's characterization of Gorbett. "When defense counsel responds to allegedly improper comments by taking liberties in his own argument, the court may determine that the improper comments are harmless in the context of the entire trial." *State v. McDaniel*, 534 N.W.2d 290, 294 (Minn. App. 1995), *rev. denied* (Minn. Sept. 20, 1995). Here, Chamberlain's counsel argued that he was unable to procure an unpaid expert, stating that he "was unable to get anybody to work for free. . . . [T]hey don't have those out there." The state asserts that "[i]nstead of objecting to the prosecutor's cross-examination or closing argument, defense counsel chose to emphasize that Gorbett is an expert" and stated that it did not matter "what state he's from or that he had to fly in here to [testify]." Lastly,

13

the state notes the district court's jury instruction that "the arguments or other remarks of an attorney are not evidence."

We are satisfied that the state has met its burden to show that any alleged prosecutorial errors did not affect Chamberlain's substantial rights. As the state notes, the evidence against Chamberlain was very strong. Chamberlain had conflicts with the residents of the duplex in the days leading up to the fire, a witness testified that Chamberlain threatened to burn the house down, another witness testified that he saw Chamberlain near the house the day of the fire, and yet another witness testified that he heard Chamberlain's voice before seeing the fire on the porch. And Chamberlain's statements to law enforcement that he did not know anyone at the house and denied ever being at the residence were contradicted by the jailhouse calls that he made. *See Eggersgluss v. Comm'r of Pub. Safety*, 393 N.W.2d 183, 185 (Minn. 1986) (noting that lack of truthfulness may show consciousness of guilt). Accordingly, for all of these reasons, Chamberlain is not entitled to a new trial.

**Affirmed.**