*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0908**

State of Minnesota,
Respondent,

vs.

Kenwan Deshawn Hunter,
Appellant.

**Filed May 6, 2024**
**Affirmed**
**Cleary, Judge**[*]

Ramsey County District Court
File No. 62-CR-21-4826

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Alexandra Meyer, Nelson Rhodus, Assistant County Attorneys, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Bratvold, Presiding Judge; Johnson, Judge; and Cleary, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**CLEARY**, Judge

In this direct appeal from the judgment of conviction for second-degree felony murder and unlawful possession of a firearm, appellant argues that (1) the state failed to prove beyond a reasonable doubt that appellant did not act in self-defense, and (2) the district court erred by providing the self-defense instruction for intentional killings where appellant did not intend to kill the victim. We affirm.

## FACTS

At 12:50 a.m. on August 16, 2021, police responded to a reported shooting at Ted's Recreation, a bar in Saint Paul. In the parking lot, officers found a red Buick with bullet holes in the passenger side doors. The victim, G.S., who was also known by the nickname "Chuck," was in the back seat of the Buick with "his legs . . . over the center console towards the front of the vehicle" and "his body in the back seat." He was not responsive and had no pulse. G.S. "was pronounced dead at the scene at 1:02 [a.m.]" Witnesses told law enforcement that G.S. and appellant Kenwan Deshawn Hunter had been "shooting at each other in close proximity" in the bar's parking lot.

Respondent State of Minnesota charged Hunter with (1) second degree murder with intent not premeditated, (2) second-degree felony murder without intent, and (3) unlawful possession of a firearm. The district court held a jury trial in January 2023. Hunter testified at trial as did several witnesses.

C.I. was present during the shooting and testified at trial. He testified that he saw two individuals, one who he identified as "Chuck," get into a "scuffle" outside the bar and

that he saw another individual "try[] to break it up." C.I. identified Hunter in the courtroom as the person who attempted to break up the fight. The two individuals fighting eventually "calmed down and they separated." G.S. got into the red Buick. Once things had "calmed down," C.I. saw Hunter "approach the red car" that "Chuck" was in and start talking with him. C.I. "heard [someone say] something along the lines of 'you're lucky this didn't get worse'" just before C.I. heard gunshots. C.I. saw some movement and "saw [Hunter] . . . lurch back at the same time [C.I.] saw a muzzle flash and heard the first shot." C.I. testified that he saw Hunter shooting and heard around eight shots; but on cross-examination C.I. testified that he did "not know who shot at who, who shot first, or even if [the victim] had a gun." C.I. ran away once he heard gunshots and later returned to the scene and called the police.

C.I.'s roommate, C.V., was also present during the shooting and testified at trial. He also saw the "scuffle" outside the bar and identified Hunter in court as a man he saw outside the bar. C.V. testified that, after the initial scuffle broke up, he went up to Hunter. "[R]ight as [he] got up to [Hunter, he] saw [Hunter move] backwards[,] go[] down into his waistband and" take out a firearm. C.V. saw Hunter fire at the Buick and heard about 12 shots. After Hunter started shooting, C.V. ran away. C.V. did not see anyone sitting inside the Buick and did not see or hear anyone shooting at Hunter.

Hunter also testified at trial. He testified that he and G.S. were friends, and that G.S. was part of a gang in Minneapolis. He testified that G.S. had been involved in previous shootings, "was a very aggressive person," "was known as a fighter," and would "go grab his gun" if he lost a fight.

3

He also testified about the incident at the bar on August 16, 2021. G.S. got into a disagreement with someone in the bar and the two of them went outside to fight. Hunter went outside with them to attempt to break up the fight. At one point, G.S. said something about "getting his sh-t," which Hunter testified "meant he was going to get his gun." G.S. went into the Buick, where his gun was located, got in the vehicle, and "rolled the window down." Hunter, who had walked with G.S. to the car, "tr[ied] to talk him down." G.S. said "I'll blow you away too" and "pulled the firearm out at [Hunter] and put it in [his] face." G.S. "started to fire" at Hunter who "jumped out of the way." Hunter then "reached for [his] firearm and tried to retreat," firing back at G.S. as he ran "to stop [G.S.] from shooting at [Hunter]."

The jury found Hunter not guilty of second-degree intentional murder, guilty of second-degree felony murder, and guilty of being an ineligible person in possession of a firearm.

## DECISION

**I.    There is sufficient evidence for the jury to have found that Hunter did not act in self-defense.**

Hunter argues that "the state did not prove beyond a reasonable doubt that Hunter did not act in self-defense." Taking the life of another can be justified when "necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor . . . to great bodily harm or death." Minn. Stat. § 609.065 (2020). A defendant has the burden to present "evidence to support a claim of self-defense, but once the defendant has

met that burden, the [s]tate has the burden of disproving one or more of the elements of the defense beyond a reasonable doubt." *State v. Vang*, 847 N.W.2d 248, 267 (Minn. 2014).

"When evaluating the sufficiency of the evidence, appellate courts carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which [the defendant] was convicted." *State v. Griffin*, 887 N.W.2d 257, 263 (Minn. 2016) (quotation omitted). Appellate courts view the evidence "in the light most favorable to the verdict" and must "assume[] that the fact-finder disbelieved any evidence that conflicted with the verdict." *Id.* Appellate courts "will not disturb a verdict if the jury, acting with due regard for the presumption of innocence and the burden of finding guilt beyond a reasonable doubt, could reasonably conclude that the defendant was guilty." *State v. Peou*, 579 N.W.2d 471, 477 (Minn. 1998).

The parties agree that the district court instructed the jury on the elements for self-defense. The elements are as follows:

> (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that [they were] in imminent danger of bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

*State v. Devens*, 852 N.W.2d 255, 258 (Minn. 2014) (quotation omitted). In addition to those elements, "[t]he degree of force used in self-defense must not exceed that which appears to be necessary to a reasonable person under similar circumstances." *State v. Basting*, 572 N.W.2d 281, 286 (Minn. 1997).

5

Hunter argues that the state did not disprove these elements. The state argues that Hunter's argument "relies on his own testimony" about G.S.'s mood before the shooting, that G.S. said he was going to "get his sh-t," which Hunter believed meant that G.S. was getting his gun, that G.S. told Hunter he was going to "blow [him] away," and that G.S. was the first one to take out a gun or shoot.

Appellate courts view the evidence "in the light most favorable to the verdict" and must "assume[] that the fact-finder disbelieved any evidence that conflicted with the verdict." *Griffin*, 887 N.W.2d at 263. We defer to the credibility decisions of the fact-finder. *State v. Dickerson,* 481 N.W.2d 840, 843 (Minn. 1992). Accordingly, although Hunter's testimony supported his argument that he acted in self-defense, looking at the evidence as a whole in a light favorable to the verdict and deferring to the jury's credibility determinations, there is sufficient evidence for a reasonable jury to determine that Hunter did not act in self-defense.

If the jury believed Hunter's testimony, it would have determined that Hunter met all four elements for self-defense because G.S. shot at Hunter first, Hunter honestly and reasonably feared for his life as he was being shot at, and, since G.S. was shooting at him, Hunter had no way to retreat, so shooting back was reasonable force. However, based on the jury's decision to convict Hunter of second-degree felony murder, the jury did not find Hunter's testimony credible, and we defer to that determination. *See id.* at 843.

Additionally, the eyewitness testimony does not corroborate Hunter's version of the events. The evidence favorable to the verdict suggests that G.S. did not shoot or take out his gun first. C.I. testified that he did not hear G.S. threaten to "blow away" Hunter and did

6

"not know who shot at who, who shot first, or even if [G.S.] had a gun." C.I. also testified that he saw movement before the shots but did "not feel comfortable saying whether or not [there was movement] inside the car." Since the jury did not credit Hunter's testimony that G.S. shot first, it accordingly determined that Hunter did not have an actual, honest, and reasonable fear of great bodily harm or death. *See Devens*, 852 N.W.2d at 258. Based on its decision, the jury also determined that Hunter had the opportunity to retreat and did not use proportionate force because he was the first to shoot. Therefore, there is sufficient evidence in the record to support the jury's determination that Hunter did not act in self-defense.

**II.    The district court did not err by providing the justifiable-intentional-taking-of-life jury instruction instead of the general self-defense jury instruction.**

Hunter argues that he is entitled to a new trial because the district court provided an incorrect self-defense jury instruction. Appellate courts "review a district court's jury instructions for an abuse of discretion. A district court abuses its discretion if it fails to properly instruct the jury on all elements of the offense charged." *State v. Stay*, 935 N.W.2d 428, 430 (Minn. 2019) (citation and quotation omitted).

When there is no objection to a jury instruction at trial, appellate courts have discretion to consider a claim of error on appeal if there was plain error affecting substantial rights. *State v. Reek*, 942 N.W.2d 148, 158-59 (Minn. 2020); Minn. R. Crim. P. 31.02. Similarly, "[u]nder the invited error doctrine, a party cannot assert on appeal an error that [they] invited or that could have been prevented at the district court," but "[t]he invited

7

error doctrine does not apply, however, if an error meets the plain error test." *State v. Carridine*, 812 N.W.2d 130, 142 (Minn. 2012).

"[T]o meet the plain error standard, a criminal defendant must show that (1) there was an error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." *State v. Myhre*, 875 N.W.2d 799, 804 (Minn. 2016). The plain error doctrine "is discretionary and authorizes appellate courts to correct only particularly egregious errors . . . in other words, those errors that seriously affect the fairness, integrity, or public reputation of judicial proceedings." *State v. Huber*, 877 N.W.2d 519, 528 (Minn. 2016) (citation and quotations omitted).

There are two forms of self-defense under Minnesota law. First, under Minn. Stat. § 609.065, subd. 1(3), "reasonable force may be used upon or toward the person of another . . . when used by any person in resisting or aiding another to resist an offense against the person." The jury instruction for defense of self or others when the death is unintentional states, in part, that "[i]t is lawful for a person, who is resisting an offense against [their] person . . . and who has reasonable grounds to believe that bodily injury is about to be inflicted to defend from an attack." 10 *Minnesota Practice*, CRIMJIG 7.13 (Supp. 2021). Second, under Minn. Stat. § 609.065, "intentional taking of the life of another" is authorized when "necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death." The instruction for justifiable intentional taking of life describes the requirements for self-defense and requires that a defendant believe that their actions were "necessary to avert death or great bodily harm." 10 *Minnesota Practice*, CRIMJIG 7.15 (Supp. 2021).

Hunter requested the following jury instruction:

> In Defense of Self
>
> No crime is committed when a person takes the life of another person, even intentionally, if the defendant's action was taken in resisting or preventing an offense the defendant reasonably believed exposed the defendant (or another) to death or great bodily harm.
>
> In order for a killing to be justified for this reason, three conditions must be met.
>
> First, the killing must have been done in the belief that it was necessary to avert death or great bodily harm.
>
> Second, the judgment of the defendant as to the gravity of the peril to which (he) (she) (or another) was exposed must have been reasonable under the circumstances.
>
> Third, the defendant's election to defend must have been such as a reasonable person would have made in light of the danger perceived and the existence of any alternative way of avoiding the peril. All three conditions must be met. The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

The district court read the jury the following instruction:

> Defense of self or others. As to each of the three counts no crime is committed when a person intentionally takes the life of another if the person's action was taken in resisting or preventing an offense of a physical nature the person reasonably believed exposed him to death or great bodily harm[.] [I]n order for the taking of a life to be justified for this reason four conditions must be met. First, the defendant's act must have been done in the belief that it was to avert death or great bodily harm. Great bodily harm means bodily injury that created a high probability of death or causes serious permanent disfigurement or causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm.

9

Second, the judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances. Third, the defendant's election to defend must have would have made [sic] in light of the danger perceived. Fourth, there was no reasonable possibility of retreat to avoid the danger. All of these conditions must be met. The person may use all force and means that the person reasonably believes to be necessary and that would appear to a reasonable person in similar circumstances to be necessary to prevent death or great bodily harm that appears to be imminent. The kind and degree of force a person may lawfully use in defense is limited by what a same situation on [sic] would believe to be necessary. Any use of force beyond that is unreasonable.

The legal excuse of defense of self or others is available only to those who act honestly and in good faith. A person may use force in defense of self or others only if the person was not the aggressor and did not provoke the offense. The defendant is not guilty of a crime if he acted as authorized by law in defense of self or others.

To prove guilt the state must prove beyond a reasonable doubt that at least one of the requirements of this defense has not been met.

Hunter did not object to the self-defense jury instruction at trial. He now argues that the district court erred by using the jury instruction for justifiable intentional taking of life instead of the jury instruction for defense of self or others when the death is unintentional, also referred to as the "general self-defense" instruction. He argues that this error prejudiced him because the justifiable-intentional-taking-of-life instruction has a "greater fear-of-harm requirement." The state argues that Hunter invited this error by requesting a "slightly modified justifiable-intentional-taking-of-life instruction." The state is correct that Hunter invited this error by requesting his proposed jury instruction and failed to object to this jury instruction at the district court level. Accordingly, Hunter can challenge the

10

self-defense instruction only if he shows that the district court's use of this instruction was a plain error that affected his substantial rights. *Reek*, 942 N.W.2d at 158-59; *Carridine*, 812 N.W.2d at 142. To succeed based on plain error, Hunter must prove that (A) there was a plain error, (B) the error affected his substantial rights, and (C) the error "seriously affects the fairness and integrity of judicial proceedings." *State v. Little*, 851 N.W.2d 878, 884 (Minn. 2014).

### A.      There was no plain error.

First, we address whether a plain error occurred. "An error is plain if it is clear or obvious, which is typically established if the error contravenes case law, a rule, or a standard of conduct." *State v. Webster*, 894 N.W.2d 782, 787 (Minn. 2017) (quotation omitted). Hunter argues that the district court plainly erred because reading the jury the justifiable-intentional-taking-of-life instruction rather than the general self-defense instruction is inappropriate when a defendant claims that "death was not the intended result." *State v. Pollard*, 900 N.W.2d 175, 179 (Minn. App. 2017). Hunter asserts that, since "[d]efense counsel argued to the jury that Hunter did not intend to kill [G.S] while he acted in self-defense," the district court should have used the general self-defense instruction. The state argues that, when Hunter testified, "[h]e did not claim that he intentionally killed G.S., but neither did he testify that he accidentally or unintentionally killed him," and Hunter did not raise the argument that he did not intend to kill G.S. until closing argument.

The Minnesota Supreme Court has held that providing the incorrect self-defense instruction is plain error. *See id.* at 179 (stating that "the Minnesota Supreme Court has

11

repeatedly stated that it is error to provide the justifiable-taking-of-life instruction, instead of the general self-defense instruction"); *Carridine*, 812 N.W.2d at 143-44 (determining that providing the justifiable-intentional-taking-of-life instruction was an error when the defendant argued that the death was unintended); *State v. Hare*, 575 N.W.2d 828, 832-33 (Minn. 1998) (determining that the district court improperly gave the justifiable-intentional-taking-of-life instruction when the defendant claimed that the death was accidental); *State v. Robinson*, 536 N.W.2d 1, 2-3 (Minn. 1995) (determining that the justifiable-intentional-taking-of-life jury instruction was incorrect when the defendant claimed the death was accidental); *see also State v. Fidel*, 451 N.W.2d 350, 356 (Minn. App. 1990) (explaining that the general self-defense instruction "is the appropriate self-defense standard for second-degree felony murder"), *rev. denied* (Minn. Apr. 13, 1990).

This case, however, is factually different than the cases in which appellate courts determined that the justifiable-intentional-taking-of-life instruction was improper. In *Pollard*, the defendant was found guilty of second-degree felony murder after swinging a knife at her boyfriend "to protect herself" while they were in a fight. 900 N.W.2d at 176-77. The defendant in *Pollard* argued at trial that she acted in self-defense and requested the general self-defense instruction. *Id.* at 177. In *Carridine*, the defendant shot at the victim's car as he drove away, after the victim pulled out a gun and threatened him. 812 N.W.2d at 136. The defendant in *Carridine* testified that "he did not intend to hit anyone; his intent was to shoot at the door until the car door closed." *Id.* Similarly, in *Hare*, 575 N.W.2d at 830, the defendant testified that "he intended to stab [the victim] in the arm to make him

12

drop his knife"; in *Robinson*, 536 N.W.2d at 2, the defendant claimed he wrestled a gun away from the victim to prevent the victim from robbing him and the gun "discharged accidentally"; and in *Fidel*, 451 N.W.2d at 356 the defendant testified that "he did not intend to kill the victim."

Here, it is less clear whether Hunter argued at trial that the killing was unintentional. Hunter did not testify as to whether the killing of G.S. was intentional or unintentional. Hunter's counsel raised a self-defense argument during his opening statement at the start of the defense's case in chief, but counsel did not specify whether the killing was intentional or unintentional. In his closing argument, after the jury instructions had already been discussed and Hunter was given an opportunity to object, Hunter's counsel argued that "[n]o crime is committed when a person takes the life of another person even intentionally and this wasn't even intentional." He also argued, however, that "Hunter did not intend to take a life, but *he had intended to take the life when confronted with this threat of death or bodily harm*, the law provides that you can do that" and then addressed the elements for justifiable intentional taking of life. Because Hunter never testified that he did not intend to kill G.S. and the record does not clearly indicate that Hunter argued that death was not the intended result, the district court was left with a difficult decision of which jury instruction to provide without clear indicia of which instruction was most appropriate. Therefore, the district court did not plainly err by providing the jury with the justifiable-intentional-taking-of-life instruction.

**B. Even if the district court had erred, there was no impact on Hunter's substantial rights.**

"An erroneous jury instruction affects a defendant's substantial rights if the error was prejudicial and affected the outcome of the case." *Huber*, 887 N.W.2d at 525. The appellant "bears the burden of establishing that there is a reasonable likelihood that the absence of the error would have had a significant effect on the jury's verdict." *State v. Horst*, 880 N.W.2d 24, 38 (Minn. 2016) (quotation omitted). Hunter argues that the verdict would have been different if the district court had read the general self-defense instruction to the jury because the justifiable-intentional-taking-of-life instruction requires that the defendant fear great bodily harm or death while the general self-defense instruction requires only a reasonable fear of bodily harm. Hunter accordingly asserts that "it would have been impossible to convince [the jury] that Hunter did not face *any* [fear of] bodily harm when [G.S.] grabbed a gun and threatened Hunter with it."

Hunter again cites to *Pollard*, where the defendant stabbed her boyfriend while the two were in a fight. 900 N.W.2d at 176-77. In *Pollard,* given the specific facts of the case, namely that the defendant claimed "that she did not intend to stab [her boyfriend], but rather was attempting to stop his continued attack," this court determined that "[i]t is possible that the jury may have reached a different verdict if the jury had been properly instructed on self-defense." *Id.* at 182. Hunter argues that this case similarly requires reversal because the evidence provided at trial supports a determination that Hunter acted in self-defense, and, had the jury been instructed with the lower fear-of-harm requirement, it would have determined that Hunter acted in self-defense out of a fear of bodily harm.

14

This case, however, is distinguishable from *Pollard* for two reasons. First, the defendant in *Pollard* claimed that killing was "accidental because [her boyfriend] would not stop attacking her," while Hunter did not testify that the killing was unintentional. *Id.* at 177. Second, in *Pollard*, the defendant's boyfriend, who had hit her in the past, "attempted to hit" the defendant and the two got into a fight. *Id.* This resulted in the defendant fatally stabbing her boyfriend while she tried to protect herself with a knife. *Id.* Her boyfriend did not have a weapon. *Id.* Therefore, in *Pollard*, it was "possible that the jury may have reached a different verdict" if the self-defense standard was fear of bodily harm rather than fear of great bodily harm or death. *Id.* at 182.

Here, the jury's decision did not depend on whether Hunter had a fear of bodily harm or a fear of great bodily harm or death. Rather, the jury had to decide whether it believed Hunter's narrative of the events. As addressed above, the jury did not find Hunter's testimony about the shooting credible and did not find credible his assertions that he shot at G.S. to defend himself. We defer to the jury's credibility determination. *Dickerson,* 481 N.W.2d at 843. Based on this determination, the use of the general self-defense jury instruction requiring that Hunter only feared bodily harm would not impact the verdict. Indeed, if the jury found Hunter's testimony that G.S. threatened and shot at him credible, it would have found him not guilty based on justifiable intentional taking of life. Therefore, any error in the jury instruction for self-defense did not impact the verdict and is therefore not prejudicial and did not affect Hunter's substantial rights.

15

Given that there was no plain error, and any error would not have impacted Hunter's substantial rights, we need not determine whether any error would seriously affect the fairness, integrity, or public reputation of judicial proceedings.

**Affirmed.**